IN RE ROBERT T. CAMERON.[*]

(*Knoxville.* September Term, 1912.)

1. **JUDGES. Are not disqualified by becoming witnesses in cases heard by them.**

A judge is not disqualified to sit in a case merely because he is a witness on the trial, in view of the statute (Shannon's Code, section 5594) expressly providing that the judge is a competent witness for either party in any case tried before him. (*Post,* pp. 623, 633, 648, 649.)

Code cited and construed: Sec. 5594 (S.); sec. 4561 (M. & V.); sec. 3811 (T. & S. and 1858).

Acts cited and construed: Acts 1824, ch. 13.

2. **SAME. Are not absolutely disqualified by personal prejudice against a party; for it is largely in his discretion whether to act or not.**

The mere fact that the judge is personally prejudiced against a party litigant does not absolutely disqualify him to sit in the case; for it is left to the personal delicacy and discretion of the judge as to whether he will act or not. (*Post,* pp. 649, 650.)

3. **ATTORNEYS. Disbarment charges may, with propriety, be formulated by trial judge, when.**

The judge's formulation of disbarment charges against a practicing attorney does not disqualify him to sit in the trial of such charges. The judge may act upon any information deemed to be reliable, and make a rule upon the attorney to show cause

---

[*]As to disqualification of judge by prior connection with case, see note in 25 L. R. A., 114.

The cases on the question whether membership in a bar association disqualifies a judge to preside at disbarment proceedings instituted by association, are collated in a note in 39 L. R. A. (N. S.), 116.

In re Cameron.

why he should not be disbarred. Especially is it not only the right, but the duty of the trial judge to formulate disbarment charges against attorneys practicing in his court, where the matter on which the disbarment is predicated is wholly or largely within his knowledge, without waiting for any motion by any member of the bar. (*Post, pp.* 650-654.)

Code cited and construed: Secs. 5781-5784 (S.); sec. 4745-4747 (M. & V.); sec. 3970-3972 (T. & S. and 1858).

Cases cited and approved: Smith v. State, 1 Yerg., 228; *In re* S. J. Henderson, 88 Tenn., 531.

4. SAME. Trial judge is not disqualified to try case by his preliminary investigation of facts before formulating charges.

A trial judge, who, before formulating disbarment charges against an attorney, based on matters within his knowledge, tested his recollection of the matter by consulting others having knowledge thereof, was not thereby disqualified to hear and determine the disbarment proceeding, upon the ground that he had become the prosecutor; for it is necessary for the protection of the bar that judges shall make some preliminary investigation before formulating such charges. (*Post, pp.* 654, 655.)

5. JUDGES. Trial judge deciding case before the hearing is disqualified to sit in the case; disbarment proceeding.

Where disbarment charges of misconduct against an attorney, formulated by a trial judge, recited that it appeared from facts within the court's knowledge that the said attorney had been guilty of acts of immorality and impropriety inconsistent with the character and incompatible with the faithful performance of the duties of his profession; that he had been guilty of a studied and matured purpose to commit a fraud upon the court; and that he was therefore ordered to show cause why he should not be disbarred; and it was charged and proved and uncontradicted that the said trial judge had stated openly and publicly that it did not matter whether the said attorney confessed the charges or not, as he could prove his guilt, the trial judge was, upon due objection being made, disqualified to hear and determine such disbarment proceeding, since a trial judge who de-

cides the case before the hearing is disqualified to sit in the trial of the case. (*Post, pp.* 655-659.)

Code cited and construed: Sec. 5706 (S.); sec. 4671 (M. & V.); sec. 3913 (T. & S. and 1858).

Constitution cited and construed: Art. 1, sec. 17; art. 6, sec. 11.

6. SAME. Same. Not disqualified by a predecision unless it be beyond doubt, nor where the judge denies it.

A trial judge is not disqualified, upon the ground that he has decided the case in advance, unless it appears beyond any doubt that such decision has been made. If the judge denies such to be the fact, that ends the controversy, whether his denial be made under a special oath, or by a general statement which must be regarded as under his oath of office. (*Post, pp.* 659, 660.)

Cases cited and approved: State, ex rel., v. Cooper, 107 Tenn., 202; State, ex rel., v. Maiden, 110 Tenn., 487.

7. CONSTITUTIONAL LAW. Supreme court cannot try a case de novo where the judgment below was void for incompetency of trial judge, with seasonable objection.

Where the trial judge was incompetent, and seasonable objection was made on that ground, the judgment in such case is void, and a trial by the supreme court upon the record would be the exercise of original jurisdiction, and the deprivation of the constitutional right guaranteed to every citizen to have his case tried according to due course of law; and the supreme court cannot, in such case, try the case *dc novo*, and render the judgment which should have been rendered below; and the statute (Acts 1911, ch. 32) dispensing with errors not affirmatively appearing to have affected the result of the trial is not applicable to such cases. (*Post, pp.* 661-668.)

Acts cited and construed: Acts 1911, ch. 32.

Constitution cited and construed: Art. 1, sec. 17.

Cases cited and approved: Arnold v. Embree, Peck, 134; Bedford v. Hickman, 1 Yerg., 166; Witt v. Russey, 10 Humph., 208; Mason v. Westmoreland, 1 Head, 555; Reams v. Kearns, 5 Cold., 217; Mathis v. State, 3 Heisk.,

In re Cameron.

127; Harrison v. Wisdom, 7 Heisk., 99, 111; Bollling v. Ander-
son, 4 Bax., 550; Smith v. Pearce, 6 Bax., 72; Crozier v. Good-
win, 1 Lea, 125; Holmes v. Eason, 8 Lea, 754; Posey v. Eaton,
9 Lea, 500; Davis v. State, 92 Tenn., 634; Dimes v. Canal Co.,
16 Eng. L. & Eq., 63; Insurance Co. v. Price, 1 Hopk. Chy. (N.
Y.), 1; Moses v. Julian, 45 N. H., 52; Shropshire v. State, 7
Eng. (12 Ark.), 190.

Case cited and distinguished:   Wroe v. Greer, 2 Swan, 172.

FROM HAMILTON.

Appeal from a disbarment proceeding in the Criminal
Court of Hamilton County to the Court of Civil Ap-
peals, and by *certiorari* from thè Court of Civil Appeals
to the Supreme ·Court.—S. D. MCREYNOLDS, Criminal
Judge.

LITTLETON, LITTLETON, & LITTLETON, for Cameron.

M. N. WHITAKER, District Attorney-General, and T.
POPE SHEPHERD, Assistant District Attorney-General,
for State.

FRANK SPURLOCK, FRANK M. THOMPSON, and S. BAR-
TOW STRANG, opposed.

MR. JUSTICE NEIL delivered the opinion of the Court.

In the criminal court of Hamilton county, on Jan-
uary 13, 1912, plaintiff in error was served with the fol-
lowing citation:

"It apearing to the court that Robert T. Cameron is a
practicing attorney at this bar, and it further appearing

to the court from such facts in the possession of and within the knowledge of the court that said Robert T. Cameron has been guilty of such acts of immorality and impropriety as are inconsistent with the character and incompatible with the faithful discharge of the duties of his profession, that he has been guilty of a studied and matured purpose to commit a fraud upon the court, to wit:

"(1) That said Robert T. Cameron was attorney for and represented one J. E. White in this court at the September term on the charge of unlawfully selling whisky within four miles of a schoolhouse; that said White was convicted of said offense and was fined $250 and sentenced to four months' imprisonment in the workhouse; that a motion for a new trial was made by said Cameron for said White, which was overruled by the court and appeal was granted to the supreme court, and defendant given thirty days to file his bill of exceptions. All of the proceedings of said trial were taken in shorthand by M. O. Cates, an experienced and reputable stenographer, and a transcript of his stenographic notes was made by the said Cates and presented to the said Cameron. A bill of exceptions was presented by the said Cameron to Attorney General Whitaker for his approval, with the representation that it was the stenographer's report of said trial. The attorney general, having confidence in Attorney Cameron, and believing his statement to be true, made a casual examination and approved said bill of exceptions as presented by the said Cameron. The court, understanding that

said bill of exceptions was the stenographer's report of said proceedings, made only a slight examination thereof, but discovered that there was no proof in the record showing that the sale of whisky in question was made within four miles of a schoolhouse.

"The court, remembering that such fact was proven and should be in the record, inserted and interlined in the paper presented by Mr. Cameron the words 'within four miles of a schoolhouse where a school was kept,' signed said bill of exceptions, and had it filed.

"During this term of court, on the 9th day of January, 1912, said Robert T. Cameron appeared before the court and asked that said interlineation as aforesaid be stricken out, and stated that such facts were not proven on the trial of said case; that he especially remembered it, and would make affidavit to that effect. The court promised to strike out said interlineation if it should appear that the statements of said Cameron in this respect were true. The said R. T. Cameron knew when he made said statement to the court that it was absolutely false, and he made it for the purpose of deceiving and practicing a fraud upon the court, and for the purpose of fraudulently procuring a new trial for his client before the supreme court.

'"(2) Said Robert T. Cameron is charged with willfully, knowingly, corruptly, and fraudulently changing and altering the first seven pages of the transcript of the stenographic report furnished him by the said M. O. Cates, which transcript as furnished by said Cates was a correct report of the testimony produced and the

proceedings on the trial. The said Cameron inserted five pages of his own composition, which did not correctly state the testimony, and correctly show the proceedings on said trial, and the said Cameron knew that his said statements as shown in said transcript were not correct, but were false and fraudulent. After altering and changing the transcript as aforesaid, the said Robert Cameron presented said paper to the court, with the representation that it was the stenographer's report of the proceedings of said trial. All of this was done by the said Cameron for the purpose of deceiving and defrauding the court, and procuring the court to certify a false and fraudulent bill of exceptions in said case.

"(3) That the said R. T. Cameron further undertook to deceive the court by attempting to have the stenographer, M. O. Cates, who reported the case, to make a statement to the court which was false and misleading in respect to the stenographic report of said case, so as to procure the court to strike out of the bill of exceptions what the court had interlined, to wit, 'within four miles of a schoolhouse where school is kept.'

"It is therefore ordered and adjudged by the court that said Robert T. Cameron be ordered to appear before the court on Saturday, January 20, 1912, at 10 o'clock a. m., and show cause why he should not be disbarred from the further practice of law in the courts of this State, and his name stricken from the roll of attorneys.

"It is further ordered by the court that the attorney general, M. N. Whitaker, and the assistant attorney general, T. P. Shepherd, are directed by the court to con-

duct these proceedings in behalf of the State of Tennessee.

"The clerk is hereby directed to issue citation to said Robert T. Cameron in accordance to this order and furnish him a copy of this order."

On February 13, plaintiff in error appeared by counsel, and moved the court to permit the cause to be heard by some other judge of concurrent jurisdiction, on the ground that Hon. Samuel D. McReynolds was interested in the event of the suit; and in this behalf he invoked article 6, section 11, of the constitution of the State, which provides as follows: "No judge of the supreme or any inferior courts shall preside in the trial of any cause in the event of which he may be interested."

In support of this motion he filed the following affidavit:

"In this case Robert T. Cameron makes oath that by and through his counsel he has moved the court to grant him a hearing before some judge who has no interest in the event of this suit. And to that end he has asked, and he now asks, that this honorable court interchange with Hon. T. M. McConnell, chancellor, residing here and now in the city, or Hon. Charles R. Evans, circuit judge, residing here and now in the city, or any circuit judge, chancellor or criminal judge in the State of Tennessee, having concurrent jurisdiction with your honor, Hon. S. D. McReynolds, in matters of this character.

"Protesting all the while his respect for and his confidence in the uprightness and integrity of this honorable court, affiant does not believe that he can get a fair

and impartial hearing of the issues before this honorable court for the following reasons, which he humbly begs to respectfully submit:

"First. Your honor, affiant is informed and believes, entered the order against affiant, citing him to appear and show cause why he should not be disbarred; and this order was entered on your honor's own motion, and is in substance a recitation that affiant is guilty of the things with which he is charged. Therefore your honor stands in relation of prosecutor of this case, and to that extent is a party to the suit or proceedings.

"Second. Your honor, affiant is informed and believes, is a witness in the case about a most material matter of fact, and your honor is the only witness against affiant as to the matter of fact; and your honor has on divers occasions and in divers places stated to divers people your honor's version of the conversation between your honor and affiant as to that matter of fact which caused your honor to enter this order, and which is the gist of this action against affiant; and your honor is naturally interested in the event of the suit and in having your honor's version of the controversy sustained and accepted.

"Third. Your honor has, as your affiant is informed, on several occasions expressed feelings of prejudice against affiant, and on one occasion used substantially this language:

" 'It does not make any difference whether Cameron confesses or not. I can prove his guilt.'

"Affiant, protesting his high regard for your honor's

position, and yet feeling no more keen resentment than what is human and possible at what your honor may have said in a moment of sudden exasperation, because of some real or reckoned sin of affiant, respectfully and humbly insists that, with this opinion formed and expressed about affiant, your honor, in the nature of things, is bound to have some interest in the event of the suit.

"Affiant avers that your honor is prosecutor and witness, and has, by virtue of your honor's position, selected counsel to represent your honor in the prosecution of affiant; that your honor has expressed the opinion that affiant is guilty of the charges, has caused an order to be entered solemnly declaring and reciting that affiant is guilty, and affiant respectfully and most earnestly insists that your honor is interested in the suit.

"All the time protesting that he means no disrespect to your honor, or your honor's high office, but that he may be tried according to the forms of law, and in the manner prescribed by law, and under the constitution of his country, affiant makes this affidavit in support of the motion filed, that he may be tried by a court having no strong feeling against him, no fixed opinion as to what the facts of this case are, and no interest in the result."

The court overruled this motion, to which action the plaintiff in error excepted.

Thereupon the cause came on for trial on the merits, and the plaintiff in error introduced his sworn answer, which was treated as his deposition. It was as follows:

"That he is thirty-five years of age, and has been a practicing member of the Chattanooga bar for a period of nine years. That he has had, and now has, a remunerative practice, and that his business has been and is in the federal, chancery, circuit, and criminal courts; the greater volume of it being in the circuit courts.

"That he has some criminal practice, and that soon after the May, 1911, term of the criminal court of Hamilton county, he was engaged to defend one J. E. White, indicted at that term for selling intoxicating liquors within four miles of a schoolhouse where school was kept, and for selling liquor without a license."

The presentment was then set out, but it is not necessary to reproduce it here.

. "That at the September term, 1911, the case of the State against J. E. White was regularly called on the docket for trial, and that respondent, Cameron, appeared in court as of counsel for White, and applied to the court for a continuance of the case on the grounds and for the reasons that two material witnesses for the defendant White were absent. A subpoena had been issued for one of these witnesses, Sam Johnson, but had not been returned, and on learning of this the day before the trial the defendant White had attempted to locate Johnson in the city and had failed. And said respondent stated to the court that the witness was not absent by the consent or procurement of defendant White, and that he expected to have him present at the next term if a continuance should be granted, and that he ex-

pected to prove, and would prove by said Johnson, that Johnson was in the place of business of defendant White when the only witness for the prosecution, one Red Gordon, was alleged to have purchased the liquor, the sale of which the indictment was founded upon, and that Johnson would prove that Gordon did not buy the liquor from the defendant White. That if any whisky had been sold or delivered to Gordon by defendant White, he would have seen it, and that he, Johnson, would prove that said State witness, Gordon, had since the date of the alleged sale of whisky by defendant White confessed to him, Johnson, that he purchased no whisky from defendant White.

"Respondent, on behalf of his client, White, further insisted on a continuance of the case because of the absence of a witness, named Stocks, who would testify that he was in the defendant White's place of business with Johnson when Red Gordon was alleged to have purchased the whisky from White, and that Stocks would testify that Gordon did not make the purchase, that he, Stocks, would have seen it if he had made it, and that no whisky was delivered to Gordon by White.

"Gordon, a negro, was the only witness for the prosecution.

"With these statements treated by agreement as sworn to, the application was overruled by the court, and the defendant put to trial.

"This application for a continuance was made at the morning session of the court, when there was no stenographer present. Court then adjourned, and at

126 Tenn. 40

the afternoon session respondent renewed his application for a continuance, but did not state his grounds as fully as on the original application.

"Under this state of affairs, the feelings of respondent were considerably wrought upon by the action of the honorable court in what the respondent then considered an arbitrary action in putting his client, whom respondent believed innocent, to trial without his witnesses, and affiant was doubtless more or less ugly, offensive, and unpleasant in the trial of the case, all of which he now deeply regrets. And finally, when the Judge, Hon. S. D. McReynolds, called the attorney general to the judge's stand and carried on a whispered conversation with him for a minute, and the attorney general turned directly to the witness then in the chair and began to ask questions, respondent supposed and believed the judge had been directing the attorney general what questions to propound to the witness, and the respondent almost involuntarily and with great feeling exclaimed, substantially:

"'I except to the court's action in assisting the attorney general in this prosecution.'

"Whereupon the court fined respondent for contempt of court, and the trial of the case proceeded with increased and increasing bitterness between the respondent and the court.

"Respondent here and now admits that his conduct and bearing toward the court was improper, and he deeply regrets it.

"The case proceeded to a verdict, and the defendant

In re Cameron.

J. E. White was convicted. Respondent made a motion for a new trial, and set out all the grounds hereinbefore named in his application for a continuance, and procured the affidavit of the defendant J. E. White."

The answer then reproduced the several affidavits which were made on the motion for new trial by White and his two witnesses, or persons whom he had desired to use as witnesses on the trial of the said case of *State* v. *White;* but they need not be set forth here, as they have no bearing on the controversy as it now stands in this court.

"If respondent's recollection is correct, and he thinks it is, the motion for a new trial was filed on Friday. The following day was motion day in the criminal court, and in the natural course of events the motion for a new trial in the *White case* was called the following day. When it was called, respondent was engaged in the trial of a criminal case for one of his best clients before a committing magistrate, and, when the clerk of the criminal court called respondent over the telephone and told him that the motion for a new trial in the *White case* was about to be disposed of by the court, respondent requested the clerk to inform the court of his situation; that is, that he was in the midst of a trial and could not get away, and to ask the court that the motion be heard on another day.

"In response to this the clerk informed respondent that the court would not grant the request. Then the respondent asked the clerk to get the attorney general

to come to the telephone. In response to this the clerk replied that the attorney general declined to come.

"The court disposed of the motion for a new trial in this way, in the absence of respondent and his client, and overruled the motion, fined respondent's client $250, and sentenced him to four months' imprisonment.

"Respondent went to the clerk to file his affidavits, and was informed by the clerk that his honor, the Hon. S. D. McReynolds, had directed that the respondent be not permitted to file the affidavits.

"Respondent honestly believed that his client was innocent, and the court's failure to grant a continuance, and subsequently a new trial on the affidavits, and the action of the court in passing upon the motion for a new trial in the absence of the defendant White and his counsel, and in refusing to continue said motion to another day, was arbitrary, and that it indicates an unfriendly personal feeling, if not a distinct animus, toward respondent, and he was, therefore, thereafter particularly care to not offend the court or to appear to violate any of its rules.

"In the trial of the *White case,* respondent had a stenographer employed to report the case, and when the proceedings above referred to were had, and the last act in the unpleasant trial before his honor, Judge McReynolds, was over, he requested the stenographer to furnish a transcript of his notes, so that a bill of exceptions might be presented to the court. The stenographer, Mr. M. O. Cates, had this done, and gave to respondent a report. Respondent took said report, and

In re Cameron.

changed the form of application for continuance as may be seen on inspection, getting the application in entirely good form, as he believed, and now believes, stating exactly what occurred, and how it occurred, protecting his client's interest, and making the record he was preparing speak the truth. Respondent changed the form of expression, but it comported exactly with what occurred, and with no view of deceiving the court, or practicing a fraud on the court.

"Respondent put in the report what occurred on the first application for 'a continuance, because the stenographer was not present at that time.

"On page —— of the report furnished respondent by the stenographer, Cates, there was a declaration of the distinguished attorney general, which was marked 'Question No. 15,' and which was in the following words:

" 'The place where he sold the liquor was in four miles of a schoolhouse?'

"And the reported response of the, witness, Red Gordon, to this declaration on the part of the attorney general, was: 'Yes, sir.'

"Respondent did not remember that such proof was made, did not believe it was made, does not remember it now, and does not believe it now.

"The alleged question is, and was, in the nature of a declaration by the distinguished attorney general, and not in the form of a question, and affiant was impressed, when he saw it in the record, that if he had heard it on the trial he certainly would have objected to it as being

leading, and suggestive, and unknown to the forms of law, and he did not remember hearing the attorney general make this declaration on the trial, and he, therefore, changed that alleged question by cutting it out of the report.

"With these changes in the report he took it to Hon. M. N. Whitaker, attorney general, who is careful and painstaking in matters of this kind, told him it was the stenographer's report, with some changes made by him, respondent, and began to point out in the report the application for a continuance, where he had changed its form to state the true facts, and yet put it in better form. The attorney general replied substantially as follows:

" 'I am not going to examine it now, Bob. I have not time. It may be filed as of this date, and you may leave it here. I want to examine it.'

"Respondent then left it with the attorney general for two or three days, until the attorney general told respondent over the telephone that he could go to his, the attorney general's, private office and get the record, that he had left it on his desk or table, and that it was all right.

"Respondent then filed it with the court, or the clerk of the court, and it was in the possession of, or at least accessible to, Hon. S. D. McReynolds from that period up until the time that respondent was cited to appear, on having called the judge's attention to the condition of the record.

"Respondent discovered that the said honorable court,

S. D. McReynolds, had interlined with a pen, at question 15, these words:

" 'And within four miles of a schoolhouse where school was kept.'

"Respondent knew that said proof was not made, at least he did not believe that it was made, he does not now believe it was made, and he did not then believe it was made, and he, therefore, took the record, and went to Hon. S. D. McReynolds, and complained of this interlineation, and asked that it be stricken out.

"His honor inquired as to what stenographer reported the case, and respondent, after some study, said it was Cates, M. O. Cates. The judge then told respondent to go to the said Cates and have his notes examined, and if that proof was not shown in the note of the stenographer he would strike it out. Respondent did go to Cates, and he here and now expressly and earnestly denies that he attempted to get Cates to deceive the court, or to practice fraud on the court.

"Respondent told Cates what the judge had inserted in the record, and asked Cates to telephone the judge that what he had inserted was not in his notes. Respondent knew that it was not, knows it was not, in the notes, and he did not then believe, and does not now believe, that the proof interlined was made, and he believes that the stenographer will verify his statement.

"Respondent says this in no disrespect to his honor, S. D. McReynolds, and respondent in no way intimates that Judge McReynolds was not acting in good faith when he made the interlineation.

"Respondent is aware that any arbitrary action on the part of the court, or the attorney general, or action that respondent may have imagined was arbitrary (and he here and now avers that he has no object to reflect on the honor, dignity, or integrity of either of these distinguished officials), would warrant or justify him in deliberately changing a record, whether it was a correct or incorrect record; but he solemnly avers that he had no purpose to change the record, or fraudulently alter it in any way, but he was making the record which he verily believed, and which he now believes, speak the truth. He submitted it to the attorney general, and left it with him for two days before it became a record authorized to be filed, and he then took it to the court for final inspection before it should become a part of the record. When Hon. S. D. McReynolds entered an order citing him to appear and show cause why he should not· be disbarred, respondent was greatly troubled in mind and pained and mortified. The order in itself is a declaration of respondent's guilt. It recites that Robert T. Cameron made an absolutely false statement to the court.

"It recites that he did it for the purpose of practicing fraud on the court.

"It adjudges respondent guilty, and recites that the facts are in the possession of and in the knowledge of the court.

"Respondent was shocked and mortified when he was cited to appear and show cause why he should not be disbarred. He consulted several lawyers, friends of his,

and members of the Chattanooga bar, and to a number
of them he confided his troubles; and in that state of
mind which this great sorrow naturally put him, he said
things and did things which in a manner reflected on
this honorable court. He has since realized, and he now
more fully realizes, that this character of talk and this
conduct on his part was highly reprehensible; that it
was an unjust and an unwarranted reflection on this
honorable court, and he deeply and greatly regrets it,
and whatever may be your honor's course in this case,
respondent profoundly apologizes for this mark of disre-
spect to the court, and asks that this honorable court
consider the great sorrow that had suddenly come upon
him, involving his character, the happiness of his family,
and everything that was and is near and dear to him.

"And having fully answered, respondent prays to be
hence dismissed."

The next witness was his honor, Judge S. D. McRey-
nolds, who was presiding on the trial which we now
have under examination. He testified as follows:

"I can make that statement first, and give you gentle-
men the right to ask me any question you may desire.

"The White bill of exceptions was in the hands of the
attorney general, so I was informed. When I saw it, as
I remember it, it was presented to me by the clerk. In
going over it—although it had been O. K.'d by the at-
torney general, the court generally looks over these
matters—and in looking over this bill of exceptions, I
found that 'within four miles of a schoolhouse, where
school was kept,' was not in there. The court was of

opinion that that was asked, but did not take his own
opinion about it, but also inquired of the attorney
general, and perhaps of the assistant clerk, or deputy
clerk, who stated he thought it was proven, or words to
that effect. And, after the bill of exceptions was on my
desk for some time—and by the way, I will say that the
bill of exceptions did not reach me within the time—
within the time given, but I was informed by the at-
torney general that Mr. Cameron had presented the bill
of exceptions to him within the time, so the bill of excep-
tions did not reach me until after the time expired, but
I did not want Mr. Cameron to lose his rights in the
court by not getting in the hands of the court, so finally
I took up the bill of exceptions. And finally it gets
here, and I directed the clerk to mark the bill of excep-
tions filed within the time, so Mr. Cameron would not
lose his rights of appeal, because it had been in the
hands of the attorney general and did not reach the
court. I presumed the clerk had marked it. I never
thought anything more about it until about the 9th of
January. I was in the office, and Mr. Cameron ap-
peared and said he wanted to see me. The court was
busy. Just a minute or two afterwards I stepped to
the door and called Mr. Cameron. He came into the
office and said: 'You have inserted something here
which ought not to be here.' He was standing up with
the bill of exceptions laid on the arm of the desk turning
over to find it. I said: 'In reference to four miles of a
schoolhouse?' He said, 'Yes,' knowing that was the cor-
rection I remembered having made. He showed it to me,

and I said: 'From the best information I can get, that was in there. I asked the attorney general, and he said it was in there, or said it was proven.' I then asked Mr. Cameron did he have any special knowledge about this matter not being proven. He said he did. He said he would swear to it, and he mentioned it to Mr. Tatum before the trial—before the motion. I said: 'Of course, Mr. Cameron, if this does not belong to the bill of exceptions, and it was not proven, and you can satisfy the court that that is correct, the court will strike it out of the record. While, of course, that means a reversal of the lawsuit, that is neither here nor there; if that was not proven, the court will strike it out.' I then said to him, 'What stenographer was in this case?' I understood him to answer rather this way, 'Marsh.' He said, 'Marsh,' and went on to describe the stenographer that takes notes here sometimes, and that I can mention if you desire. I said to him I would not put much credibility in his reports, because I had had some little experience here with him in another case. He then said, 'Morrison.' I said, 'Do you mean Charlie Morrison?' He said, 'Yes.' The court said to him: 'If it is Charlie Morrison, Buchanan, or Cates, they are all reputable stenographers, and you can see them, and can see about it. If they state to you that it was not in there, I will strike it out'—and asked him to see them. He went out of the office, and left the bill of exceptions. I don't know whether he left it with me, or carried it back to the clerk's office. The court immediately went around to the other court, and found Mr. Morrison, and asked him

about it. Mr. Morrison said he was satisfied he was not the man that reported it; that he did not think he reported but one case here. The next morning I was called by Mr. Cates—gentlemen, I realize this is not competent right here, unless you show that Mr. Cates was instructed or had some authority to speak from Mr. Cameron; but I can give you this statement if you desire that.

"Mr. Jesse Littleton: We do not make any objection, you honor.

"Court (continuing): Mr. Cates then brought me the copy of the transcript which he claimed to have furnished to Mr. Cameron, and I went over it, and I found—

"Mr. Jesse Littleton: . Now, if your honor please, it has not been proven to be a copy of the transcript.

"Mr. Whitaker: We will prove that.

"Court: I will stop there. That is all the court can state now, unless you make the others things competent.

"Mr. Jesse Littleton: I will ask your honor this: Will your honor allow me to ask you—after examining Mr. Cates, to ask you two or three questions?

"Court: Yes, sir; any time."

The next witness called was the stenographer, M. O. Cates. This witness testified that he was the stenographer who took the case of *State* v. *White*, and that he made a correct record of the proceedings, and that he offered upon the trial of the present case a correct copy of his report, fully compared with his notes.

In re Cameron.

He further testified that, after his notes were written up, he took the original and carbon copies both to Mr. Cameron, with a bill for both; that he never saw the original copy again until after Judge McReynolds ordered him to bring the carbon to his office. He identified the original copy which he handed to Mr. Cameron.

In making out the identification the witness was asked:

"Look at this copy, and say whether or not that, as a whole, is the document you handed to Mr. Cameron. A To the best of my knowledge and belief, the first page is, the second page is not, neither is the next, neither is the next. The balance of it is my work, to the best of my knowledge and belief. Q. State whether or not you had the pages numbered when you presented it? A. Yes, sir. Q. There is five pages substituted for seven of your own pages; did you count them? A. I think that is right.

"Mr. Shepherd: Now, if your honor please, without reading these two pages, I will just treat them as read, showing the difference in the two records.

'Court: All right.

"Q. Now, Mr. Cates, the carbon copy that has been introduced is the carbon copy of your notes? A. Yes, sir; that is the carbon copy of the original transcript I delivered to Mr. Cameron.

"Mr. Shepherd: Q. Now, Mr. Cates, did Mr. Cameron come to your office some time after the 9th of January, and make any statement to you with reference

to this transcript? A. He came to my office some time during January; I don't know what part of the month. Q. State what he said to you. A. I cannot state the exact words, the language of Mr. Cameron; I can give the substance. Mr. Cameron came to my office and told me what Judge McReynolds inserted in the record, and he said he did not think it was in there. Q. Did he have that record with him? A. He did not. Q. What else did he say? A. He told me that when he went to see the judge about it—now this is the substance of it—the judge insisted that he was not absolutely sure it was in there, neither was Mr. Whitaker sure it was in there. He told me he had changed the form of the application for a continuance to a certain extent, and had called their attention to it, and that it was all right, and then he said that Judge McReynolds told him that, if I would call him up and state that what he had added was not in the record, he would strike it out, and then Mr. Cameron asked me to look at my notes, and [I] looked at them and told Mr. Cameron what was there. Then Mr. Cameron insisted that what the judge had added to the transcript was not in there, and I told him that it was not, and then he asked me to call him up and state that the thing that he had inserted in the transcript was not in my notes. Q. State whether or not you got your carbon copy and showed Mr. Cameron what the carbon copy showed? A. I did not at the time Mr. Cameron was talking about it; I had forgotten that I had a carbon copy. Q. Did you get your notes? A. I did. Q. Read your notes to Mr. Cameron? A. Yes,

sir.  Q.  You read your notes in accordance with that carbon copy, did you not?  A.  Yes, sir.  Q.  And then he asked you to call up Judge McReynolds and say to him that the thing was not in your notes?

"Mr. Jesse Littleton:  We object, your honor, to Mr. Shepherd stating that.

"A.  Yes, sir.  He asked me to call up Judge McReynolds and say that what he had inserted, the language, was not in my notes.

"Mr. Jesse Littleton:  Was that after you had read the notes to him?  A.  Yes, sir.

"Mr. Shepherd:  Did he ask you to say anything else?  A.  Did not.  Q.  Well, did he say anything about the judge doing that, or what was said?  A.  Well, after I had read the—what my notes showed, why he stated that the way it was, he had left out just a little, and that judge had added a little, and that is the sum and substance of it.  Q.  Did he state whether or not he still wanted you to call up the judge and make that statement to him?  A.  I think that was the last thing he said to me as he left the office.  Q.  Did you call up Judge McReynolds?  A.  I did.  Q.  Then later you came to Judge McReynolds' office, did you?  A.  Yes, sir, at his request, I did.  Q.  State whether or not you compared the two records in Judge McReynolds' office?  A.  Yes, sir.  Q.  And then found the discrepancies?  A.  Yes, sir; I did not compare the application for continuance.  I compared the page to my testimony.  Q.  What else did Mr. Cameron say about this White case?  A.  Why, he stated that he had gone to Judge McReynolds and told him he did not believe that was in there, and

Judge McReynolds thought it was in there, and thought that another stenographer named Norris had reported the case, and he told him, 'No,' that Cates had reported the case, and that he had done his reporting in that case, and then that Judge McReynolds told him to have me call Judge McReynolds up, and if I would state that was not in there, he would strike it out, and he also made the remark that he would not miss reversing the case for $500."

On cross-examination:

"Q. When he came to you about this matter, he did not offer you any inducement to deceive the court, did he? A. He did not. Q. He did not offer you any inducement, or any reward of any kind, to say anything to the court? A. He did not. Q. He did not intimate that he wanted you to deceive the court, did he? A. He merely asked me to call the court up and say that the language he had added was not in my record. Q. Do you remember what was in that record, Mr. Cates, what part was changed—do you remember what was in there? A. I think so. I have my shorthand notes with me. Q. Look at that question 15, 'The place where he sold that liquor was without [within] four miles of a schoolhouse? A. That is correct according to my notes. Q. Is that a correct copy? A. Yes, sir. Q. Now, look here, where Judge McReynolds interlines, and compare that: 'In Chattanooga, Hamilton county, and within four miles of a schoolhouse where school is kept.' Is that in your notes? No, sir; not the exact language. Q. It is not in your notes anywhere, where school was kept?' A. No, sir. Q. That is not in your notes? A.

In re Cameron.

No, sir. Q. Mr. Cates, did Mr. Cameron ever talk with you about this since that time? A. He never has. Q. He never has mentioned it to you? A. No, sir. Q. He has not sent for you? A. He has not. Q. You have talked with the judge about it and compared notes? A. Yes; when I brought the record over here we talked about it, and we compared the two. Q. And you gave the judge all the information you had relating to it? A. I think I did; yes, sir, all that he asked me to."

Then comes the following in the record:

"Judge S. D. McReynolds, being cross-examined by Mr. Jesse Littleton, testified as follows:

"Q. Has your honor any special recollection of it being proven, 'where school was kept?' A. No; as I stated to Mr. Cameron, that I only had a general recollection at the time. Q. Does your honor have any recollection now that that was really proven? No; no special recollection that it was proven. Mr. Littleton, I thought it was proven, in reference to 'within four miles of a schoolhouse.' I never considered it very material 'where school was kept.' I inquired about it—asked the attorney general if he had any recollection of it, and the attorney general said it was, and he would make affidavit it was, and I inserted it. Q. You not only discussed it with the attorney general, but with the clerk, or the deputy clerk? A. I think I did mention it to him. Q. Now, then, Judge, the clerk and the attorney general and you agreed that it was proven? A. Yes, sir; we thought that it was. I do not know that I mentioned 'within four miles of a schoolhouse where school

126 Tenn. 41

was kept,' because I never thought that was material. Q. Well, did your honor just insert that 'where school was kept' without any recollection? A. General recollection only. Q. And you did not discuss that with the attorney general? A. I don't think I did—I don't know whether I mentioned 'where school was kept' or not. Q. But you did discuss whether 'within four miles of a schoolhouse' was proven? A. Oh, yes; and he told me he would make affidavit that it was proven. Q. That 'within four miles of a schoolhouse' was proven? A. Yes, sir. Q. The attorney general did? A. Yes, sir. Q. Now, did the clerk agree with the attorney general? A. I think he did. Q. Now, then, Judge, after you had discussed this with the attorney general, you added this, 'within four miles of a schoolhouse where school was kept?' A. Yes, sir. Q. And you have no independent recollection now that it was proven, 'where school was kept?' A. I certainly have not. Q. Did your honor add this in here: 'It was a White Oak whisky bottle'—did your honor add this, 'He said it was?' A. That was made after comparing this—after I got the carbon, merely to show the difference in this page and the page that was furnished him.

"Court: I will state this for you. Mr. Cates called me up, he said at the direction of Mr. Cameron—

"Mr. Jesse Littleton: If your honor please, we object to anything Mr. Cates said.

"Court: Well, Mr. Cates has been on the stand. He said this, and I might tell you what he said Mr. Cameron told him.

"Mr. Jesse Littleton: If your honor please, that is what we are objecting to.

"Court: I understood he was speaking for Mr. Cameron.

"Mr. Jesse Littleton: If your honor please, he had no authority to speak for Mr. Cameron. The only way in which you could make that competent would be to contradict this gentleman. And if your honor please, we do not want to impeach him, and we think it is incompetent.

"Court: What Mr. Cates told me?

"Mr. Jesse Littleton: Yes, sir; we do. We insist that is incompetent in any phase of the lawsuit. That is not a part of the *res gestae;* it is hearsay."

The next witness was M. N. Whitaker, the district attorney general. He testified as follows:

"Q. You are the attorney general of this circuit, are you, Mr. Whitaker? A. Yes, sir. Q. Did you try the case—represent the State in the trial of *State* v. *J. E. White?* A. Yes, sir. Q. At the last term of court? A. Yes, sir. Q. State whether or not you remember whether in the trial of that case it was proved that the sale of whisky in question occurred in four miles of a schoolhouse? A. Yes, sir. Q. You remember that proven? A. Yes, sir. ·Q. Did Mr. Cameron present to you a transcript of the record in that case? A. The stenographer's report. Q. This transcript of the report? A. Yes, sir. Q. Did you O. K. that paper? A. Yes, sir; that is my O. K. on the back of it. Q. State what Mr. Cameron said to you at the time he presented it with reference as to whether or not it was a steno-

graphic record.  A.  Mr. Cameron came to my office
with this bill of exceptions in this case, and, if I remem-
ber correctly, it was the last day in which he had to
present it under the law, and for that reason he wanted
me to pass on it at once.  I said to him that I was busy,
and did not have time to do it then, but that I would
agree that the bill of exceptions be filed as of that date.
That was satisfactory to him, and he either indorsed
that then on the bill of exceptions or later, and left it
there with me, but before leaving I asked him if he had
presented me the stenographer's report of the case, and
he said he did.  So, I examined it, either the next day or
the day following, I am not sure which, made a very
superficial examination of it, because of it being a
stenographer's report, and I O. K.'d the bill of excep-
tions without discovering that it did not contain the
statement that the whisky was sold within four miles of a
schoolhouse.  Q.  Did Mr. Cameron say anything to you
with reference to his having changed it to some extent?
A.  I am sure he did not, but I am conscious that human
memory is frail at the best.  If he had stated that to me
I would have examined it—examined it carefully.  I
have no recollection of his telling me that he had
changed it in any way, and if he had told me that, I
don't believe I would have O. K.'d the bill of exceptions
without a more careful examination.  Q.  State whether
or not you O. K.'d the bill of exceptions under the im-
pression that it was the stenographer's report?  A.
Yes, sir; I did.  Q.  State whether or not you knew that
the paper had been changed in any way when you pre-
sented it to Judge McReynolds?  A.  I did not.  Now,

I want to state this: That at the same time I had a bill of exceptions on my desk in another case, I forget what case it was, from Mr. Schoolfield, and I passed up both bills of exceptions at the same time. Mr. Schoolfield's was one of his characteristic bills of exceptions, gotten up according to his own recollections of the case, and I had a lot of trouble trying to correct it, and make it state anything like what I believed the occurrences were, as is usual, and I know I though at the time that I wished he had presented me a stenographer's report like Mr. Cameron did.

"Mr. Jesse Littleton: We object to what the attorney general thought.

"Mr. Shepherd: It shows the direction of the attorney general's—

"Mr. Jesse Littleton: Direction of what he thought; but we object to that, and we move to strike that out.

"Court: Overrule the objection."

On cross-examination:

"Questions by Mr. Jesse Littleton:

"General Whitaker, you say you had two bills of exceptions, one for Mr. Cameron, and one for Mr. Schoolfield? A. Yes, sir; I think Mr. Schoolfield's had been there for several days. Q. How long had this bill of exceptions Mr. Cameron left with you stayed there? A. I am not clear in my mind. I believe about two days. Q. Two days? A. Yes, sir; I think so. Q. And from the day he left it there with you it remained in the same room until you glanced over it and O. K.'d it, and then telephoned him to come and get it? A. Yes; after I passed on it, and O. K.'d it, I called him up over the

telephone, and told him where it was in my office, and told him, if I was not there when he came, he would find it at a certain place, and, if my recollection serves me correctly, he came in my absence and got it.   Q. You have tried a great many cases that have been appealed?   A.   Sir?   Q.   You have tried a great many cases that have been appealed recently?   A.   Oh, yes. Q.   And so bills of exceptions are being constantly presented to you for your O. K. and approval?   A.   Oh, yes.   Q.   You say human memory is frail at best—you do not pretend to recollect, Mr. Whitaker, what conversation occurred between you and the attorney in any particular case in every particular?   A.   I do not in every case; but I do in this particular case.   Q.   You remember   what   occurred   between   you   and   Mr. Cameron?   A.   No; I only—   Q.   You do not pretend to say that your memory has been impressed with this or that remark?   A.   How is that?   Q.   You do not pretend to say that your memory has been impressed with what occurred in this particular case more than in any other?   A.   No; no; I don't.   Q.   Now, Mr. Whitaker, in this bill of exceptions that was filed, in which his honor inserted this, have you any recollection of it being proven in the trial that it was 'without four miles of a schoolhouse, where school was kept?'   A.   I have no recollection on the proposition of where school was kept; I have no recollection of that.

"Mr. Whitaker:   That is all for the State.

"Mr. Whitaker:   I think the court ought to state whether or not Mr. Cameron disclosed whether or not it was a stenographic report.

"Court: The court has stated the first conversation between Mr. Cameron and himself. And it was on the proposition to strike this out that the court wanted the evidence. And shortly after that Mr. Cameron came up to the court while he was on the bench, and asked me what I was going to do about that *White case*, and I said to him, 'Things don't look regular about that Mr. Cameron, and you will likely get an opportunity to explain it,' and I asked him—

"Mr. Jesse Littleton: Now, if your honor please, with all due deference to your honor, that does not throw any light on the issues of the case, and is simply a colloquy between your honor and the defendant, and I think it is an injustice to him.

"Court: It was in reference, Mr. Littleton, to this bill of exceptions.

"Mr. Jesse Littleton: Now, your honor has testified as to what occurred between your honor and the defendant at different times.

"Court: That is, as to what occurred in the office. I was going to tell you what occurred at the bench.

"Gen. Whitaker: If it was in relation to the bill of exceptions, if it was what your honor told the defendant—

"Court: After I got it.

"Mr. Jesse Littleton: We object.

"Court (continuing): I said to Mr. Cameron that he would likely get a chance to explain this matter, and he made some remark, and I told him that I found that a question had been sustituted in the first witness' examination, and another question left out, and the ques-

tion left out was, 'Was that within four miles of a
schoolhouse?' or "That was within four miles of a school-
house?" and he said something about it being copied,
and I asked him who copied it, and he said something
about his stenographer copying it, and he told me
her name, and then made some remarks about the court
not allowing him to file some affidavits. That is as far
as 'the conversation went. I believe he said—I don't
know, but I believe he said a young lady by the name of
Miss O'Rear; I don't know whether there is any such
young woman or not, but I believe that is what he
said."

The defendant then introduced some fourteen wit-
nesses, who testified, in substance, that defendant was a
person of good repute and of good character. No evi-
dence was introduced in behalf of the State to contro-
vert this.

There was no other evidence introduced upon the trial
of the cause.

The trial judge thereupon rendered a judgment hold-
ing the defendant guilty on all of the charges made
against him, and adjudged him disbarred. From this
judgment an appeal was prayed to the court of civil ap-
peals. In that court a decision was rendered to the
effect that under the facts appearing in the record
Judge McReynolds was disqualified to try the case, and
on this ground his judgment was reversed, and the
cause remanded for a new trial.

From the foregoing decision a *certiorari* was prose-
cuted to this court, and the case is now here for ex-
amination and decision.

The first question to be determined is whether Judge McReynolds was disqualified.

Much is said in the brief of counsel for Mr. Cameron, based on the fact that the trial judge was a witness in the cause. Our statute settles this matter in a few words. It is laid down in Shannon's Code, sec. 5594: "The judge of a court is a competent witness, for either party, in any case tried before him, either of a civil or criminal nature." This was taken from chapter 13 of the Acts of 1824, and has ever since remained the law of this State, unrepealed and unmodified. However inconvenient or embarrassing it may be for the trial judge to be cross-examined by the attorneys for one side or the other, or for him to pass upon objections to the competency of questions and answers, or whatever may be said as to the policy of the statute, it is the law of this State, and must be obeyed. Questions of policy are for the legislature.

It is also insisted that the trial judge was personally prejudiced against defendant because of the facts which had transpired during the trial of the case of *State* v. *J. E. White;* also on the motion for continuance, and the motion for new trial. Several of the States of the Union have statutes upon this subject, laying down the rule that this will make a judge incompetent. We have no such statute; moreover, we doubt the policy of such legislation. It is entirely conceivable that an upright and honest judge may decide justly and impartially as between his bitter personal enemy and his warm personal friend, administering the rules of law without fear or favor. Such a situation should be left

to the personal delicacy of the judge, and not be a matter of absolute law. It is easy to conceive that under the opposite rule, an upright and impartial judge would often be recused by affidavits as to his personal prejudices against one party or the other, to the great detriment, embarrassment, and delay of the administration of justice. It is exceedingly easy for litigants and counsel to imagine that a judge is prejudiced against a party, or against his counsel, who has failed to successfully prosecute, or successfully defend, any one or more cases. It is an infirmity of human nature that counsel, whose feelings and personal interests are deeply enlisted in every important case they try, are frequently unable to attribute want of success to the inherent weakness of the case, or to their own shortcomings in the management of it. It is a matter of general knowledge among lawyers that the refuge of defeated counsel is far too often abuse of the court, referred to pithily by lawyers as "cussin' the court." When the tide turns, and success crowns the effort of previously disappointed counsel, his opinion of the intelligence, learning, and probity of the court experiences a high, upward tendency. To allow personal feelings like these on the part of counsel to determine what judge shall try a case, it seems to us, would be disastrous. The new judge selected might not meet the approval of the counsel of the other side, and he would also have to be recused, and so on, resulting in a scramble, undignified and humiliating.

It is also urged that the trial judge acted improperly in making an order on his minutes, formulating charges against the defendant. There is nothing in this. Where

the trial judge has information of improper conduct on the part of any member of his bar, it is not only his right, but his duty, to formulate charges, and to appoint counsel to represent the State in the prosecution of such charges. In the present case Judge McReynolds appointed the district attorney general and his assistant. This was entirely proper. There is no other way authorized by law to initiate such charges, when the matters involved are in the knowledge of the court alone. Of course, it is true that any member of the bar may bring to the knowledge of the court improper conduct on the part of any other attorney, and ask for a rule on such attorney to show cause why he should not be disbarred. However, where the matter on which the disbarment is predicated is wholly or largely within the cognizance of the judge, there is no impropriety in his making the rule himself, without any motion on the part of any member of the bar. Such was the course of this court in the case of *In re S. J. Henderson,* 88 Tenn., 531, 13 S. W., 413.

The provisions of the Code upon this subject are as follows:

Section 5781: "The several courts of this state may strike from their rolls any person not authorized to practice in such courts, and also any practicing attorney or counsel, upon evidence satisfactory to the court that he has been guilty of such misdemeanor, or acts of immorality or impropriety, as are inconsistent with the character, or incompatible with the faithful discharge, of the duties of his profession."

Section 5782: "If charges are preferred against an attorney or counsel to any court, they shall be reduced to writing, and a copy furnished the party accused, who may appear and shown cause against the charges."

Section 5783: "The person stricken from the rolls under either of the foregoing sections, or for other good cause, shall not be permitted to practice the profession in any court of record in this State."  •

Section 5784: "When any inferior court shall order any attorney thereof to be stricken from its roll of attorneys, or prohibit any attorney from practicing therein, such attorney shall have the right to appeal from such order or refusal to the supreme court, as in other cases, and, for that purpose, shall have his bill of exceptions, as in actions at law, and the supreme court shall render such judgment as is meet and proper in the premises."

The first three of these sections were taken from the acts of 1815, 1817, and 1821. ·

As shown in *Smith* v. *State,* 1 Yerg., 228, the origin of the practice above outlined is to be found in an old English statute passed in the reign of Henry IV. This statute first provides for placing attorneys upon the roll after examination as to their character and attainments, and as to their taking the oath, and then provides: "And if any such attorney be hereafter notoriously found in any default of record, *or otherwise,* he shall forswear the court, and never after be received to make any suit in any court of the king. They that be good and virtuous, and of good fame, shall be received

and sworn at the discretion of the justices; and if they are notoriously in default or misdemeanor may be removed upon evidence either of record or not of record." It is remarked in the case referred to that this statute has received the sanction of four centuries, and that there is nothing in any provision in any act of assembly of this State which is not in strict affirmance of this old act. The case then proceeds to outline the practice where the charges are initiated by some one other than the judge. It is said that a charge may be exhibited to a judge, in or out of court, alleging the default or misdemeanor complained of, and, if the judge deem the charge sufficient to warrant disbarment, he shall cause the attorney to be furnished with a copy, and cite him to appear in open court, when the proceedings are conducted in all respects as under the British statute. This information, it seems, need not be made to the judge in the form of affidavits filed in open court, but he may take knowledge from any source that may seem to him reliable. On this subject the court said, in the case referred to: "Pleas and demurrers never entered the mind of the legislature, when prescribing the mode of proceedings by the act of 1815. They only meant that the plain man, ignorant of law, should have a plain remedy against a man of a profession possessing many advantages in skill over him; that his statement should be taken as *prima facie* true, the same as the affidavits upon which the rule was grounded by the previous practice, requiring legal skill, not always and in all situations to be easily obtained against another lawyer. The

practice is a correct one, from which innocence has nothing to fear." From this it appears that the judge of a court may consider information given him by any reputable person in respect of the conduct of the members of his bar, and if he deem this information reliable he may make a rule upon the attorney to show cause why he should not be disbarred.

There can be no sound objection that, before making the rule, the trial judge conducted such investigations on his part as would enable him to ascertain whether there was any probable foundation for the charges. This power in the judge is not only a necessary one to enable him to perform his duty correctly, but it is in its nature highly beneficial to the bar, and has a strong tendency to protect its members against frivolous charges of disappointed litigants. It would, without doubt, be seriously embarrassing, and very unjust to the bar, if it should be held the duty of the judges of this State to make a rule upon an attorney to show cause, upon the mere fact that information of improper conduct had been conveyed to them, without more. It would be equally unfortunate for the proper discipline of the bar, and the purging of unworthy members from its body, if the judge were bound to await formal application in open court by some other member of the bar. We, all know how loath are members of the bar to assail another member in this manner, even though he may be guilty, or charged with being guilty, of very bad, disreputable conduct. Under the law the members of the bar are appointed to office by the body of judges, and

the power that appoints can likewise remove. As to the method of the exercise of that power, this is to be determined by the court, in the absence of legislative direction.

Now, recurring to the duty of the judge before he causes to be entered a rule against a member of the bar to show cause, we have seen how necessary for the protection of the bar it is that he shall make some investigation in order to ascertain whether the charge is one merely frivolous. In this view we do not think the strictures upon Judge McReynolds contained in the brief of defendant's counsel are well based, wherein they discuss his action in conferring with the district attorney general and the clerk as to whether the testimony in question had been given in court on the trial of the *White Case;* that is to say, it was proper for the judge to test his own recollection of the matter by the recollection of others who were present at the trial and heard it. It is not just to characterize such investigation as the preparation of a case by opposing counsel, nor on such facts to charge that the judge was both prosecutor and judge.

We come now to a matter which is of graver import.

It was set forth in the answer of defendant, taken as his deposition, that Judge McReynolds said openly and publicly, in effect, that it did not matter whether defendant confessed the charges or not; that he, the judge, would prove his guilt. It is argued from this that his honor had already decided the case before hearing the

defense. There is no contradiction in the record that the judge did make this statement.

It is likewise objected that Judge McReynolds, also in the language of the rule which he caused to be entered, decided the case before it was heard. The rule contains the following preamble and conclusion:

"It appearing to the court that Robert T. Cameron is a practicing attorney at the bar and it further appearing to the court, from such facts in the possession of and within the knowledge of the court, that said Robert T. Cameron has been guilty of such acts of immorality and impropriety as are inconsistent with the character and incompatible with the faithful discharge of the duties of his profession, that he has been guilty of a studied and matured purpose to commit a fraud upon the court, to wit: [Specifications.] It is therefore ordered and adjudged by the court that said Robert T. Cameron be ordered to appear before the court on Saturday, January 20, 1912, at 10 o'clock a. m., and show cause why he should not be disbarred from the further practice of law in the courts of this State, and his name stricken from the roll of attorneys."

The language used indicates that the judge had already decided the matters involved in the citation.

Now the question to be determined is whether a judge is competent to try a case, where he has already decided it against the defendant before the latter has been heard in his defense.

It is provided in article 6, section 11, of the constitution of 1870:

"No judge of the supreme or inferior courts shall preside on the trial of any cause in the event of which he may be interested, or where either of the parties shall be connected with him by affinity or consanguinity within such degrees as may be prescribed by law, or in which he may have been of counsel, or in which he may have presided in any inferior court, except by consent of all the parties."

In Shannon's Code, section 5706, it is provided:

"No judge or chancellor shall be competent except by consent of all parties to sit in the following cases: (1) Where he is interested in the event of any cause; (2) or connected with either party by affinity or consanguinity within the sixth degree, computing by the civil law; (3) or has been of counsel in the cause; (4) or has presided on the trial in the inferior court; (5) or in criminal cases for felony where the person upon whom, or upon whose property the felony has been committed is connected with him by affinity or consanguinity within the sixth degree, computing by the civil law."

Neither the constitution nor the statutory provision covers in terms the case of a judge who has already decided the controversy before he has heard it. We are of the opinion, however, that such a case falls within the meaning of both; that is, of the provision in each that no judge shall preside in any case in which he may have been of counsel, or in which he may have presided in any inferior court. The purpose of these two provisions was to guard against prejudgment of the controversy. It was necessarily supposed, as the basis

126 Tenn. 42

of these provisions, that where a judge had been of counsel, he had already made up his mind as to the merits of the case; equally where he had presided in the trial of the case in the inferior court, and had decided it, or had taken part in the decision of it. Now, it seems idle to assume that it was the intention of the people who made the constitution, and of the representatives of the people who passed the act reproduced in section 5706, that the mere fact of a judge's having been of counsel, or of his having presided on the trial of a cause in an inferior court, should render him incompetent, when he would be competent to hear a particular controversy which he had already decided before hearing. The fundamental principle is that parties litigant are entitled to an impartial judge. It is only when the people are satisfied that impartial judges decide their controversies, that they entertain feelings of reverence for the judgments of the courts of the land. We say the people. We mean the people at large. There are always discontented, unhappy, and morose spirits who will question the good intentions of judges, though they be men of spotless honor and blameless life. Such men have no criterion of praise or blame, except in so far as they can see personal profit or personal loss to themselves, measured by the results of the cases which they conduct before the courts. The views of such persons count for nothing. But it is of immense importance, not only that justice shall be administered to men, but that they shall have no sound reason for supposing that it is not administered. It is of lasting importance

that the body of the public should have confidence in the fairness and uprightness of the judges created to serve as dispensers of justice. The continuance of this belief, so long entertained by the people of this country, and so well warranted by the history of the judiciary as a body, is largely essential to the future existence of our institutions in their integrity. We say it is a fundamental principle that the judge shall be impartial. We are aware that there may be a difference of opinion as to the true test, in the absence of constitutional or statutory provisions. The history of English law shows this. Therefore we deem it important that we should stand by the constitution and the statutes; but, in construing these, they should not be subjected, as we believe, to a mere dry and literal rendering, but should be applied according to the spirit, instead of the mere letter. The reason of the law is the law. Moreover, in addition to the section of the constitution above referred to, we believe the case falls also within article 1, section 17, which provides: "That all courts shall be open; and every man, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay."

Beyond question it is not according to due course of law to compel a man over his protest to try his case before a judge who has already decided it, and has announced that decision in advance of the hearing. It is equally true that such compulsion is a denial of justice.

In what has been said we are not to be understood

as holding that a judge can be recused on the ground that he has adready decided the case, merely by motion supported by affidavits so stating. It must appear, as in the present case, beyond any doubt that such decision has been made. If the judge deny such to be the fact, that ends the controversy; and it cannot be pursued further, or re-examined on that point in this court. This is the rule established in cases of *mandamus* upon judges to incorporate into bills of exceptions matters of evidence alleged by the petition to have been wrongly excluded. If the judge returns there was no such evidence, that ends the matter. *State, ex rel.,* v. *L. P. Cooper,* 107 Tenn., 202, 64 S. W., 50; *State, ex rel.,* v. *Maiden,* 110 Tenn., 487, 75 S. W., 710. By referring to these cases it is not meant that a judge must, in the kind of case before us, make denial on special oath when so charged. Any statement by him on the subject must be regarded as made under his official oath.

In what we have said we do not desire to be under stood as indulging in harsh criticism of Judge McRey nolds. The record of this case shows that he was sorely tried by the very bad conduct which defendant confesses to in his answer, and for which he furnished a very late apology. It was very natural that Judge McReynolds, after having been subjected to such disrespectful treatment at the hands of Mr. Cameron during the trial of the case of *State* v. *White,* should have felt some resentment therefor, and thus have been hurried into a hasty determination of the matters involved in the present case. Of course, it was his duty, sitting as a judge on

the bench, to suppress every feeling of personal resentment, and to forbear the decision of the case, even in his own mind, until he should hear the evidence and the arguments of course I, and it was entirely possible to do so. It would have been far safer, however, and more in accordance with the proprieties of the situation, after having formulated the charges (in the form of charges, and not of decision), to have interchanged with some other judge to try the case, in view of the personal feeling which he entertained by reason of the gross discourtesy to which he had been subjected by counsel in the matters leading up to the present controversy. He did not, however, do this, nor was he bound to do so; but he was bound not to decide the case in advance, either orally or by a decision put upon the record, as shown by his language copied into this opinion. Having so decided the matter, he immediately became incompetent to try it. It was then his duty to interchange with some other judge for the trial of this particular case, or to call some other judge to sit for him in his court and hear the case.

It is insisted in behalf of the State that, notwithstanding the incompetency of Judge McReynolds, this court should proceed to try the case *de novo,* and render such judgment as he ought to have rendered, according to the rule laid down in chapter 32 of the Public Acts of 1911. But the mere statement of the rule shows the unsoundness of the sugestion, since the trial judge should not have entered any judgment at all, being incompetent as he was. Chapter 32 has no bearing upon

such situation. That chapter presupposes a competent judge, and the duty of this court to re-examine his proceedings for error. It is provided in that act that no verdict or judgment shall be set aside, or a new trial granted, on the ground of error in the charge of the judge to the jury, or on account of the improper admission or rejection of evidence, or for error in acting on any pleading, or for any error in procedure—all of which things presuppose a competent judge in charge of the case, passing on questions of pleading, evidence, and procedure, and giving instructions to the jury. It is provided in the statute referred to that the appellate courts of this State shall not reverse on any of the grounds stated, unless it shall affirmatively appear that the error complained of has affected the results of the trial. Whose error? Manifestly the error of a competent judge in charge of the case in the court below. To apply this statute to a case where the judge is incompetent, and his incompetency not only not waived, but openly objected to, would be not only to deprive the litigant of his right to his trial in a court of first instance, but would require this court to exercise original jurisdiction, since there is no doubt that under such circumstances the judgment of the court below is simply void. *Reams* v. *Kearns,* 5 Cold., 217; *Smith* v. *Pearce,* 6 Baxt., 72; *Mathis* v. *State,* 3 Heisk., 127. These cases are subsequently qualified on another point in *Holmes* v. *Eason,* 8 Lea, 754, and *Posey* v. *Eaton,* 9 Lea, 500, and *Crozier* v. *Goodwin,* 1 Lea, 125. It was held that they were erroneously determined in so far as they decided

In re Cameron.

that the judgment was void when rendered by an incompetent judge; no objection to his competency appearing to have been made at the time by either of the parties. It was held that in such case the incompetency was waived. In *Holmes* v. *Eason* the court said: "At common law, it was well settled that, although no judge ought to act where, from interest or from any other cause, he is supposed to be partial to one of the suitors, yet his action in such case was regarded as an error or irregularity not affecting his jurisdiction, and to be corrected by a vacation or reversal of his judgment except in the case of those inferior tribunals from which no appeal or writ of error lies. *Dimes* v. *Grand Junction Canal Co.,* 16 Eng. L. & Eq., 63; *Washington Ins. Co.* v. *Price,* 1 Hopk. Ch. (N. Y.), 1. And, generally, if the facts are known to the party recusing, he is bound to make his objections before issue joined, and before the trial is commenced; otherwise he will be deemed to have waived the objection in cases where the statute does not make the proceedings vaid. *Moses* v. *Julian,* 45 N. H., 52, 84 Am. Dec., 114; *Shropshire* v. *State,* 7 Eng. (12 Ark.), 190. The decisions of this court first above cited are in accord with these conclusions. If the objection be raised of record, and the court undertake to proceed notwithstanding, the judgment might be held void under these principles, as was done in *Reams* v. *Kearns.* But if no objection be made, and the court is permitted to go to a trial of the case on the merits, the judgment is clearly not void on its face, and something more than the mere existence of the fact on which the

incompetency rests should be required to authorize a resort to another tribunal. The terms of the statute are sufficiently met by holding the proceedings invalid if the objections be made, unless the incompetency be waived in the mode prescribed by the statute. In this view, the judgment would be voidable, not void, in all cases in which the record failed to show the preliminary objection." In the present case, as we have already noted, due objection was made in the trial court.

It was held in *Wroe* v. *Greer,* 2 Swan, 172, that where a case was tried before a justice of the peace, who was incompetent, and then appealed to the circuit court, the trial might proceed, regardless of the incompetency of the justice of the peace, because, it was said, the appeal vacated his judgment, and that the trial in the circuit court was *de novo.* We have no case in this State that follows *Wroe* v. *Greer* on this special point. Under all of the other cases the rule appears to have been to reverse and remand. In *Holmes* v. *Eason,* supra, such is stated to have been the rule at common law, citing *Dimes* v. *Grand Junction Canal Co.,* 16 Eng. L. & Eq., 63. This case is also cited with aproval in *Harrison* v. *Wisdom,* 7 Heisk., 99, 111. And see *Arnold* v. *Embree,* Peck, 134; *Bedford* v. *Hickman,* 1 Yerg., 166; *Witt* v. *Russey,* 10 Humph., 208, 51 Am. Dec., 701; *Mason* v. *Westmoreland,* 1 Head, 555, and *Reams* v. *Kearns,* supra, in which the practice seems to have been used, or stated as the proper course, without discussion or doubt. It is true that all of these cases, except *Reams* v. *Kearns,* arose on a want of jurisdiction of the subject-matter in the justice of the

peace; the amounts sued for being beyond that jurisdiction, though within that of the circuit court. The principle is the same, however, as where a judgment has been rendered by a judge in the lower court who was personally incompetent—that is, without jurisdiction or power to try the case—where that incompetency was not waived, but expressly objected to before him. An appeal from such a judgment in the circuit or chancery court could not confer power upon the supreme court to dispose of the merits of the controversy; nor could the transfer of the cause to this court by the writ of *certiorari* have that effect. All that this court ought to do, or could do, in such a case, would be, in the exercise of its supervisory power over all inferior tribunals, to reverse and remand for a lawful trial. Having discovered this first and cardinal error, it will go no further. It was so held in *Reams v. Kearns.* Parties have the right to have their cases tried before the regularly constituted tribunals of the State, and neither the judges of this court, nor the judges of any inferior courts, can deprive them of it. A court is not lawfully constituted, as to the special case, if the judge is incompetent to try it, and his incompetency is objected to at the time. As to that case it is the same as no court if the judge be incompetent. It is not only the right of a party under the distribution of judiciary powers directed by the constitution, and ascertained and formulated by legislative acts, to have his case first tried in the lower court; but it is important that he should have the benefit of those proceedings, not only

for the aid they may furnish on a subsequent trial in this court, or the court of civil appeals, but also because of the possibility of a termination of the controversy in that court without the expense and delay of a trial in an appellate court. A denial of such preliminary trial is a deprivation of the right guaranteed to every citizen to have his case tried according to due course of law, and is a violation of article 1, section 17, of the constitution, supra. There is one case, however, *Bolling* v. *Anderson,* 4 Baxt., 550, where, among many other objections taken to the decree of the chancellor, one was that he was incompetent to try the case. Without discussing the question of practice, the court, after considering all the points, reversed the decree and discharged the garnishment. It was shown in that case that the judgment *nisi* was pronounced against one Turley, as garnishee, by Chancellor Harrison, who, it appeared on the record, was incompetent. The court said that the decree must fail on that ground, and also on the ground that no notice of the garnishment had been served on the garnishee, Turley; that *sci. fa.* was ordered issued returnable to the first Monday in December, but was made returnable to the first Monday in February. On these grounds the court considered the case and reversed the decree. The question of practice was not discussed.

The case of *Wroe* v. *Greer* was decided upon two points: First, that the incompetency of the justice of the peace was waived, because the party failed to make the objection before him; secondly, in the alternative,

that, even if it had not been waived, it would cease to have any application to the case, because the appeal to the circuit court had the effect to supersede the judgment of the justice of the peace, and the case was tried *de novo* upon its merits before a competent court. The court said it was the same as if the case had been originally instituted, as it might have been, in the circuit court. "The question" (said the court) "whether the competency of the justice had been waived while the case was before him had ceased to be of any utility or effect in the case, now that it was no longer before him, and was again to be tried upon its original facts in the same manner as if there had been no former trial." It is also true that in disbarment proceedings, on appeal to this court, the case is tried *de novo*. *Ralph Davis* v. *State,* 92 Tenn., 634, 23 S. W., 59. So far the analogy between the two cases holds. But it fails in one essential point. After an appeal to the circuit court from a judgment rendered by a justice of the peace, the witnesses are introduced in the circuit court just as if there never had been any trial before the justice. The case comes before the circuit court simply upon the warrant, and the return of the officer showing the service. In the case now under examination, however, the evidence was taken in open court, and objections were offered to testimony, and rulings thereon made by the disqualified judge—all preserved by a bill of exceptions. In other words, he presided at the trial, which we are to review for the purpose of discovering whether there were any errors committed. While a trial *de novo* in

In re Cameron.

this court on appeal from a decree of the chancery court must be had without giving any weight whatever to the findings of the trial judge, yet there are various orders which can and do very materially limit at times the scope of the relief that can be granted by this court. The same is true, of course, on appeals of the same nature from a circuit or criminal court, with the added disadvantage that the disqualified judge has to pass upon the report of the evidence contained in the bill of exceptions, and authenticate that instrument, and make it a part of that record of the cause. On the contrary, on an appeal from a justice of the peace's judgment the case is absolutely open, on new evidence, just as if there had never been a trial before him. We are of the opinion, therefore, that *Wroe* v. *Greer* must stand upon its own facts, and that it is not an authority for such a case as we have before us.

It results that we affirm the judgment of the court of civil appeals in remanding the case for new trial before a competent judge. We do not, however, agree with that court in all the reasons which it gave for its decision, or further than that, on disqualification of the judge appearing, the case should be reversed and remanded. We do not express any opinion whatever on the facts of the case, deeming it improper to do so, inasmuch as the facts must come before a trial judge, and be heard and first passed on by him.