IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Special Session June 19, 2006

## SEDLEY ALLEY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County
No. 85-05085-87     W. Otis Higgs, Jr., Judge**

---

**No. W2006-01179-CCA-R3-PD  - Filed June 22, 2006**

---

In 1985, the Petitioner, Sedley Alley, was convicted of aggravated rape, kidnapping, and first degree murder.  For the capital crime of first degree murder, the jury imposed the sentence of death. Petitioner Alley's execution was scheduled for May 17, 2006; however, on May 16, 2006, the Governor, upon recommendation of the Tennessee Board of Probation and Parole, granted a fifteen-day reprieve to allow the Petitioner the opportunity to petition the trial court for DNA testing of "those additional items that were not included in his 2004 petition."  On May 19, 2006, Petitioner Alley filed a petition to compel testing of evidence under the Post-Conviction DNA Analysis Act of 2001.  The post-conviction court denied the petition on May 31, 2006.  Our supreme court, on June 2, 2006, rescheduled Petitioner Alley's execution for June 28, 2006. *See State v. Sedley Alley*, No. M1991-00019-SC-DPE-DD (Tenn., at Nashville, June 2, 2006) (*order*).  The Petitioner sought and was granted expedited review by this Court.   Upon review of the record and the responses by both parties, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Barry C. Scheck, Vanessa Potkin, and Colin Starger, New York, New York, and Paul R. Bottei and Kelley J. Henry, Nashville, Tennessee, for the appellant, Sedley Alley.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Jennifer L. Smith, Associate Deputy Attorney General, for the appellee, State of Tennessee.

**OPINION**

**<u>PROCEDURAL BACKGROUND</u>**

On July 11, 1985, nineteen-year-old Marine Lance Corporal Suzanne Collins' life was terminated after being beaten, raped, and impaled with a thirty-one-inch long tree branch. *See State v. Alley*, 776 S.W.2d 506, 508 (Tenn. 1989), *cert. denied*, 483 U.S. 1036, 110 S. Ct. 758 (1990). The Petitioner, Sedley Alley, who was almost thirty years old at the time, was arrested after providing a "lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985." *Id*. A Shelby County jury found Petitioner Alley guilty of the kidnapping, aggravated rape, and premeditated first degree murder of the victim. The jury found two aggravating circumstances, *i.e.*, the murder was especially heinous, atrocious, or cruel and the murder was committed during a kidnapping and rape, and sentenced Petitioner Alley to death. *See Alley*, 776 S.W.2d at 508. "He was sentenced to 40 years on each of the other offenses, all sentences consecutive." *Id*. at 508. For the two remaining convictions, the trial court imposed consecutive forty-year sentences. *Id.* Petitioner Alley's convictions and sentences were affirmed on direct appeal. *Id.*

This case has been the subject of extensive appellate review. The Petitioner sought post-conviction relief, which was denied. *See Alley v. State*, 958 S.W.2d 138, 140 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1997). On appeal, this Court reversed the lower court's denial, ordered the recusal of the trial judge, and remanded the case for a new hearing. *See Alley v. State*, 882 S.W.2d 810 (Tenn. Crim. App. 1994). Upon remand, Petitioner Alley was again denied relief. *Alley*, 958 S.W.2d at 140. On appeal, this Court affirmed the lower court's denial of post-conviction relief. *Id*. In 1998, Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Western District of Tennessee. The district court summarily dismissed the petition. *See Alley v. Bell*, 101 F. Supp. 2d 588 (W.D. Tenn. 2000). The Sixth Circuit Court of Appeals affirmed the lower court's dismissal. *See Alley v. Bell*, 307 F.3d 380 (6th Cir. 2002), *cert. denied*, 540 U.S. 839, 124 S. Ct. 99 (2003), *reh'g denied*, 540 U.S. 1086, 124 S. Ct. 952 (2003). Thereafter, the State of Tennessee filed a motion in the Tennessee Supreme Court requesting the setting of an execution date. On January 16, 2004, the Tennessee Supreme Court granted the State's motion, setting the execution date for June 3, 2004. *See State v. Sedley Alley*, No. M1991-00019-SC-DPE-DD (Tenn. Jan. 16, 2004) (*order*).

On May 4, 2004, Petitioner Alley unsuccessfully sought post-conviction DNA analysis in the Shelby County Criminal Court. *See Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *1 (Tenn. Crim. App., at Jackson, May 26, 2004), *perm. to appeal denied*, (Tenn. Oct. 4, 2004), *cert. denied*, 544 U.S. 950, 125 S. Ct. 1695 (2005). This Court affirmed the lower court's denial. *Id.* Petitioner's June 3, 2004, execution date was stayed by order of the federal district court as a result of the Petitioner's filing a motion under Rule 60(b) of the Federal Rules of Civil Procedure. The motion was rejected and, on March 29, 2006, the Tennessee Supreme Court rescheduled Petitioner Alley's execution for May 17, 2006. *See generally Sedley Alley v. Ricky Bell,* Nos. 05-6876, 06-5552, 2006 WL 1279050 (6th Cir. May 9, 2006), *reh'g en banc denied*, (May 15,

2006) (denying habeas claim as successive habeas petition). One week later, the Petitioner filed a complaint in the United States District Court for the Western District of Tennessee requesting injunctive relief in the form of access to certain evidence introduced in his criminal trial for purposes of DNA testing at his own expense. The district court dismissed Alley's 42 U.S.C. §1983 action for failing to state a claim upon which relief could be granted. *See Alley v. Key*, – F. Supp. 2d –, 2006 WL 1302213 (W.D. Tenn. 2006). The Sixth Circuit affirmed the district court's dismissal, adding that there is no general constitutional right to post-conviction DNA testing. *See Sedley Alley v. William R. Key*, No. 06-5552, 2006 WL 1313364 (6th Cir. May 14, 2006), *reh'g en banc denied*, (May 16, 2006).

On April 11, 2006, thirty-six days prior to his scheduled execution, the Petitioner brought a claim under 42 U.S.C. §1983 challenging Tennessee's lethal injection protocol. On May 11, 2006, the federal district court issued an order staying the Petitioner's execution. This order was vacated by the Sixth Circuit on May 12, 2006. *Sedley Alley v. George Little,* No. 06-5650, 2006 WL 1313365, (6th Cir. May 12, 2006), *reh'g en banc denied*, (May 16, 2006). The Petitioner then sought a stay of execution from the United States Supreme Court and petitioned for a writ of certiorari, seeking review of the Sixth Circuit Court of Appeals' decisions in the three federal cases of *Sedley Alley v. George Little, Sedley Alley v. William R. Key*, and *Sedley Alley v. Ricky Bell*. Certiorari is currently pending before this nation's highest court.

On May 16, 2006, the Governor of Tennessee granted a fifteen-day reprieve of the execution of the Petitioner's sentence to permit Petitioner Alley to return to state court and seek permission to perform a DNA analysis of certain items allegedly not included in a previous petition for DNA analysis filed by Petitioner Alley in 2004.

## I. Petitioner Alley's Request

On May 19, 2006, Petitioner Alley filed, pursuant to Tennessee Code Annotated sections 40-30-304 and 40-30-305, a petition for post-conviction DNA analysis in the Shelby County Criminal Court. In the petition, Petitioner Alley requested testing of numerous items omitted from his first petition under the Act, including:

(1)    skin cells/sweat from the [men's red] underwear that were found next to the victim's body and believed to have been worn by the assailant;

(2)    blood or skin cells on a stick used to violate the victim, including the paper in which the stick was wrapped; and

(3)    material from underneath the fingernails of the victim.

The Petitioner asserted that "these items," "in addition to the swabs from the victim possibly containing semen, could be subjected to STR DNA testing to conclusively prove (or disprove)

Mr. Alley's innocence." He also requested DNA testing on "blood and a hair found on and in his car that were directly linked to the victim at trial using primitive ABO testing and microscopic hair analysis."

Petitioner Alley claims that DNA testing of these items has the potential of identifying the real perpetrator of the crime. Specifically, Petitioner Alley asserted that "redundant results" (DNA tests results that establish the same genetic profile on a number of probative items of evidence) can establish the true perpetrator of the crime and exclude him as the perpetrator. While he asserted that testing of the aforementioned items would most clearly exonerate him, he further argued that testing of additional items should be subjected to examination as these items could contain additional evidence and create additional redundant results. These items include:

(1)     Sleeveless jersey type shirt;
(2)     One white tube sock belonging to the victim;
(3)     One pair of jogging shorts belonging to the victim;
(4)     The victim's bra;
(5)     The victim's white cotton panties;
(6)     Blue exercise belt belonging to the victim;
(7)     Left jogging shoe belonging to the victim;
(8)     Right jogging shoe belonging to the victim;
(9)     Styrofoam drinking cups;
(10)    Bloodstained grass collected from beneath the victim's vaginal area; and
(11)    Beer bottles.

Petitioner Alley maintains that testing of these items could very well establish a DNA match to the victim's boyfriend, John Borup. Petitioner asserts that Mr. Borup admitted to being with the victim on the night of her murder, Mr. Borup more closely matches the description of the abductor, and Mr. Borup drove a dark, wood-paneled Dodge Aspen station wagon. Furthermore, Petitioner Alley asserts that DNA testing results could be entered into CODIS or a state DNA database and "score a 'hit' to a convicted offender, thus not only exonerating Mr. Alley, but also identifying the actual assailant." In this regard, Petitioner Alley maintains that he has "the right to do DNA testing of the crime scene evidence to prove third party guilt, whether that comes about by linking DNA from the crime scene evidence to a convicted offender in the CODIS database or directly to Mr. Borup."

Petitioner Alley further contends that, in making the determination of whether he would have been prosecuted in light of exculpatory DNA results, the reviewing court is not limited to the evidence introduced at trial, but is required to consider all of the evidence, including factual allegations developed by the Petitioner post-judgment. In this regard, the Petitioner contends that the court must consider the following:

(1)     Evidence that the medical examiner had determined that the victim had died between 1:30 a.m. and 3:30 p.m., contrary to the State's theory at trial that the victim had died at 11:30 p.m.;

(2)  Petitioner Alley had no motive to kill the victim, while her boyfriend, John Borup, did;

(3)  An expert, Dr. Richard Leo, has determined that the Petitioner's confession is unreliable and not true;

(4)  The victim's boyfriend, John Borup, fit the description of the abductor as 5'8"; medium build; short, dark brown hair; dark complexion; and no facial hair;

(5)  John Borup drove a dark-colored Dodge Aspen station wagon;

(6)  The tire tracks and shoe prints from the abduction scene are not from the Petitioner's station wagon or from his shoes; and

(7)  Hairs and fingerprints found on items near the victim's body do not belong to Petitioner Alley.

The State of Tennessee filed a response in opposition to Petitioner Alley's request for DNA testing, asserting that "the petitioner has raised no additional arguments that would justify a different judicial ruling than the one previously rendered by the trial court and affirmed by the Tennessee Court of Criminal Appeals in 2004."

## II. Post-Conviction Court's Ruling

On May 31, 2006, the post-conviction court entered its order denying post-conviction DNA testing.  The court determined that "the petitioner has failed to meet the statutory requirements which would mandate DNA Analysis as outlined in Tenn. Code Ann. § 40-3[0]-304 and has not convinced this court that discretionary analysis should be granted under the Tenn. Code Ann. § 40-3[0]-305."  The post-conviction court continued:

With regard to requirements of Tenn. Code Ann. § 40-3[0]-304, the court finds that petitioner has failed to demonstrate that a reasonable probability exists that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples; has failed to demonstrate that some of the samples sought are still in existence and/or are in a condition that is suitable for testing; and petitioner has failed to demonstrate that the purpose of the petition is to determine actual innocence and not merely to delay the execution of his sentence.  *See*  Tenn. Code Ann. § 40-30-304(1), (2) and (4).  Thus, testing is not mandated in this case.

Additionally, this court finds that the petitioner has failed to demonstrate that a reasonable probability exists that analysis of said evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction. *See* Tenn. Code Ann. § 40-30-305. Thus, this court is not inclined to order testing under the discretionary portion of the Act. . . .

After entry of the post-conviction court's ruling but before a notice of appeal document was filed by the Petitioner, the Tennessee Supreme Court granted the State of Tennessee's motion to rescheduled the execution date. In this regard, the Tennessee Supreme Court ordered that the Petitioner's execution date be reset for June 28, 2006. In light of the imminent execution date, Petitioner Alley expeditiously filed a notice of appeal on June 7, 2006. On June 8, 2006, the Petitioner filed with this Court a motion to expedite the appeal and to also seek oral argument in this matter. The Petitioner's motions were granted by order entered June 9, 2006.

## III. The Act

The Post-Conviction DNA Analysis Act of 2001 provides that a person convicted of certain enumerated crimes, including first degree murder, may, *at any time*, file a petition requesting forensic DNA analysis of any evidence, which may contain a biological specimen, (1) in the possession or control of the prosecution, law enforcement, laboratory, or court, and (2) that is related to the investigation or prosecution that resulted in the judgment of conviction. T.C.A. § 40-30-303. The Act provides no statutory time limit and gives petitioners the opportunity to request analysis at "any time," whether or not such a request was made at trial. *Griffin v. State*, 182 S.W.3d 795, 799 (Tenn. 2006). A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

-6-

T.C.A. § 40-30-304; *see also Griffin*, 182 S.W.3d at 798. Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when the petitioner meets the same conditions. T.C.A. § 40-30-305; *see also Griffin*, 182 S.W.3d at 798. In either instance, some physical evidence must be available and in a proper condition to enable a DNA analysis. T.C.A. § 40-30-304(2).

"'If the state contests the presence of any qualifying criteria and it is apparent that each prerequisite cannot be established, the [post-conviction] court has the authority to dismiss the petition.'" *Marcus Nixon v. State*, No. W2005-02158-CCA-R3-WM, 2006 WL 851764, at *3 (Tenn. Crim. App., at Jackson, Apr. 3, 2006) (quoting *William D. Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App., at Nashville, Apr. 24, 2003), *perm. to appeal denied*, (Tenn. 2003)). That is, a petitioner's failure to meet any of the qualifying criteria is fatal to the action. *William D. Buford*, 2003 WL 1937110, at *6. Moreover, the Act does not specifically provide for a hearing as to the qualifying criteria and, in fact, authorizes a hearing only after DNA analysis produces a favorable result. *See* T.C.A. § 40-30-312.

The post-conviction court is afforded considerable discretion in determining whether to grant a petitioner relief under the Act, and the scope of appellate review is limited. *See Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *3 (Tenn. Crim. App., at Jackson, May 26, 2004), *perm. to appeal denied*, (Tenn. Oct. 4, 2004), *cert. denied*, 544 U.S. 950, 125 S. Ct. 1695 (2005) (citing *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, 2004 WL 199826, at *4 (Tenn. Crim. App., at Knoxville, Feb. 3, 2004), *perm. to appeal denied*, (Tenn. Oct. 4, 2004) (citation omitted)). In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party. *Id.* The lower court may also consider the opinions of this Court and the Tennessee Supreme Court on direct appeal of the petitioner's convictions or the appeals of the petitioner's prior post-conviction or habeas corpus actions. *Id.* On appellate review, this Court will not reverse unless the judgment of the lower court is not supported by substantial evidence. *Id.* (citing *Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4 (Tenn. Crim. App., at Nashville, Apr. 11, 2003)).

## IV. Post-Conviction Court's Partiality and Bias

Petitioner Alley asserts, in his pursuit of post-conviction DNA analysis, that he was denied a fair hearing before an impartial and unbiased tribunal. Thus, he contends that this matter should be remanded for a hearing before an impartial judge. In support of his claim, the Petitioner asserts (1) the post-conviction court irrationally refused to recognize the power of DNA testing to prove third-party guilt and the exculpatory impact of DNA Database Identification; (2) the post-conviction court denied the Petitioner an evidentiary hearing, thereby

categorically prohibiting the presentation and consideration of evidence; (3) the post-conviction court refused to permit the Petitioner to make an offer of proof; (4) the post-conviction court prejudged the case as evidenced by the court's ruling from the bench after a brief recess; and (5) the post-conviction court engaged in inappropriate *ex parte* communications with the Assistant District Attorney General.

A fair trial in a fair tribunal is a basic requirement of due process. The principles of impartiality, disinterestedness, and fairness are fundamental concepts in our jurisprudence. *See State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996)). Article I, Section 17 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution guarantee all litigants a hearing before an impartial decision-maker. *In re Cameron*, 126 Tenn. 614, 658, 151 S.W. 64, 76 (1912); *see also Tumey v. Ohio*, 273 U.S. 510, 532, 47 S. Ct. 437, 444 (1927) ("Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law."). Article VI, Section 11 of the Tennessee Constitution states that judges cannot participate in cases in which they might have even the slightest interest. *Neely v. State*, 63 Tenn. 174, 182 (1874). A similar restriction appears in section 17-2-101(1), Tennessee Code Annotated. The purpose of these provisions is to guard against the prejudgment of a litigant's rights and to avoid situations in which the litigants might believe that the court reached a prejudiced conclusion because of interest, partiality, or favor. *Chumbley v. People's Bank & Trust Co.,* 165 Tenn. 655, 659, 57 S.W.2d 787, 788 (1933). A trial before a biased or prejudiced judge is a denial of due process. *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998).

With respect to the Petitioner's allegations that the post-conviction court "prejudged" the matter and engaged in improper *ex parte* communications with the Assistant District Attorney General, we conclude that the Petitioner's allegations are just that – allegations. The record fails to support these allegations, and this Court is not permitted to engage in speculation. Moreover, while the record does reflect that the post-conviction court refused to permit him to present the testimony of an expert, we are unable to conclude that this action indicated bias by the post-conviction court as the Post-Conviction DNA Analysis Act does not contemplate an evidentiary hearing until after DNA testing produces results favorable to the petitioner. T.C.A. § 40-30-312. Neither does the Act mandate that the trial court grant a petitioner permission to take depositions. Rather, any such action is within the trial court's discretion. *See* T.C.A. § 40-30-311 (court may enter orders as may be appropriate). Accordingly, this Court cannot agree with the Petitioner's assertion that the post-conviction court was partial and biased. This claim is without merit.

## V. Evidence Rejected by this Court in the 2004 Petition

In support of his claim that the presumed exculpatory results of DNA testing would have resulted in the Petitioner not being prosecuted or convicted, the Petitioner urged consideration of "additional exculpatory evidence such as the time-of-death revelations when considering the reasonable probability prong." As previously asserted in his 2004 petition, Petitioner Alley again asks the courts of this state to disregard certain trial evidence as unreliable. The lower court specifically determined that "nothing in the case law either suggests or requires the court to accept or entertain extraneous information or newly propounded theories by either side." We agree.

In the Petitioner's 2004 petition, he urged the court to disregard certain evidence as unreliable and to consider newly discovered evidence that discredited evidence used to convict the Petitioner, including: (1) his confession, (2) documents from Dr. Bell revealing the victim's time of death was later than originally thought, (3) the description of the perpetrator does not match the Petitioner's description, (4) the description of the vehicle provided by the witnesses does not match that of the Petitioner's vehicle, (5) tire tracks at the abduction scene do not match the Petitioner's vehicle, (6) fingerprints on a beer bottle recovered near the victim's body are not identical to the Petitioner's, and (7) shoe prints at the abduction scene do not match the shoes he was wearing on the night in question. This request was unsuccessful. *See Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at * 3. Additionally, the Petitioner challenges the post-conviction court's June 8, 2006, order, barring the Petitioner from including as part of the appellate record the affidavits of investigator April Higuera.[1] The post-conviction court determined that the material contained in the affidavits were not relevant to the issues involved in the court's determination.

In the present petition, the Petitioner, again, asks this Court to discredit or ignore certain evidence introduced at trial and to consider newly discovered evidence tending to exculpate the Petitioner, that is, the same evidence argued in the 2004 petition. The Post-Conviction DNA Analysis Act does not require nor permit the lower court to re-evaluate the credibility or validity of the evidence submitted at trial. Nor does the Act permit the court to consider new evidence, aside for DNA test results, supporting a different theory than the one relied upon by the petitioner. The Post-Conviction DNA Analysis Act is not the proper vehicle to seek review of evidence other than results available from DNA testing of biological specimens recovered during the course of the investigation or prosecution of the petitioner. *See generally* T.C.A. § 40-30-302. Other avenues exist for consideration of newly discovered evidence in both the state and federal courts.

---

[1]On June 12, 2006, Petitioner Alley filed with the Shelby County Criminal Court Clerk an amended notice of appeal document challenging the post-conviction court's June 8, 2006, order.

## VI. Third-Party Evidence and DNA Database

The Petitioner argues that he is entitled to have the results of the DNA testing compared to a third-party person and the results checked against known violators in a public DNA database. In support of his argument, the Petitioner relies primarily upon the United States Supreme Court decision in *Holmes v. South Carolina*, 547 U.S. ---, 126 S. Ct. 1727 (2006). In *Holmes*, the United States Supreme Court affirmed a long line of cases holding that neither statutes nor state evidentiary rules can irrationally restrict a defendant from exculpating himself through proof that a third party is guilty. *Holmes*, 547 U.S. at --, 126 S. Ct. at 1729. In this regard, the Petitioner asserts that the "no third party guilt" rule imposed by the post-conviction court is irrational and unconstitutional. He argues that:

> it is inconceivable that the same male DNA profile could be on the murder weapon, the red underwear, and the victim's clothing. No single person who was not involved in the crime could have his DNA on all of these items. Mr. Alley has simply requested that the court consider the possibility that redundant results could point to the same third party, and also the possibility that this third party could be identified through use of DNA databases.

He contends that to deny him third-party comparison defeats the purpose of the DNA Act in that "the Act was passed specifically not only to exonerate the innocent, but also to identify actual perpetrators of offenses who, without DNA testing, are roaming free" (citing Legislative Tape #3 on SB 796: Senate Judiciary (May 15, 2001) (Senator Cohen)). Petitioner Alley further asserts that he is not asking that DNA testing be performed on any third party. Rather, he seeks only to test crime-scene evidence that may contain the DNA of the perpetrator. Finally, Petitioner Alley contends that the State of Tennessee, by enacting the Post-Conviction DNA Analysis Act, has "created a liberty interest for convicted defendants to secure release from prison by means of DNA testing." Thus, he argues that "the courts cannot restrict an inmate's statutory right to vacate his conviction, much less prove his actual innocence, by irrationally and unfairly preventing him from using DNA testing to prove third party guilt."

First, Petitioner's reliance on *Holmes* is misplaced. The holding in *Holmes* was limited to the right of a criminal defendant to present a complete defense at trial. Thus, we would be constrained to extend the *Holmes* rule to post-conviction DNA proceedings and decline to do so. As further support for his entitlement to have DNA test results processed through a DNA data bank in order to search for serial perpetrator matches, Petitioner Alley relies upon this Court's opinion in *State v. Johnny Moffitt*, No. W2001-00781-CCA-R3-CD, 2002 WL 818247, *1 (Tenn. Crim. App., at Jackson, Apr. 19, 2002), *perm. to appeal denied*, (Tenn. Oct. 21, 2002). The appeal in *Moffitt* presented a certified question of law resulting from the defendant's guilty plea to second degree murder. *Id.* "The precise question [before the Court] is whether the defendant is entitled to a dismissal due to the loss of [evidence by the State]." *State v. Johnny Moffitt*, No. W2001-00781-CCA-R3-CD, 2002 WL 818247, at *2. This Court held that the fact that evidence was lost did not warrant dismissal *per se*. *Id*. at *5. Rather this Court held than an instruction to the jury would "have been more than sufficient to resolve the issue." *Id.* The

-10-

Petitioner argues that the holding in *Moffitt* is applicable here "in the context of the reasonable probability analysis . . . [and] if the State were to refuse to put the male DNA profile . . . in the CODIS database, under *Moffitt*, the trier of fact must assume that the results . . . would 'hit' on a serial offender." Again, the issue in *Moffitt* focused upon the remedy for "lost" evidence within the context of a jury trial. Accordingly, we reject the Petitioner's argument that *Moffitt*'s holding should be extended to determinations of "reasonable probability" under the Post-Conviction DNA Analysis Act.

In *Alley I*, this Court held that the "purpose of the Post-Conviction DNA Analysis Act is to establish the innocence of the petitioner and not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant." *Alley*, 2004 WL 1196095, at *9. The Act's reach is limited to the performance of DNA analysis which compares the petitioner's DNA to samples taken from biological specimens gathered at the time of the offense. The statute does not authorize the trial court to order the victim to submit new DNA samples years after the offense, nor does the statute open the door to any other comparisons the petitioner may envision. *Earl David Crawford v. State*, No. E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App., at Knoxville, Aug. 4, 2003), *perm. to appeal denied*, (Tenn. Dec. 22, 2003). This Court rejects any implied testing of third party individuals or the need to "run" DNA testing results through a DNA database for "hits." Indeed, other states have rejected requests to compare DNA profiles with state and national DNA databases as "add[ing] yet another layer of speculation." *See Commonwealth v. Smith*, 889 A.2d 582, 586, n.6 (Pa. Super. Ct. 2005). Nor can this Court endorse the Petitioner's argument that Tennessee created a "liberty interest" in using DNA testing to prove third party guilt. Since states have no obligation to provide for post-conviction relief of any form, including DNA testing, *see Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S. Ct. 1990, 1994 (1987), there is no inherent right to a certain type or method of testing when seeking such relief. Any liberty interest that exists, therefore, must be one created by state law. And, while there may be a liberty interest in testing biological samples for DNA created by enactment of statutory provisions, such right to access potentially exculpatory evidence does not remain unconditional. *See generally Kenneth Lynn Moore v. Bill Lockyer*, No. C04-1952 MHP, 2005 WL 2334350 (N.D. Cal. Sept. 23, 2005). Any interest created by enactment of the Act created a limited interest of a defendant in establishing his/her innocence and did not create an interest in establishing the guilt of a speculative and unknown third party.

The Petitioner concedes that "should the samples yield results which cannot be linked to either the defendant or the victim then the evidence would demonstrate that he did not rape and kill the victim, but that someone else did." This concession negates the need or requirement under the Act, at this juncture, for database comparison or third-party comparison. The results of DNA testing must stand alone and do not encompass a speculative nationwide search for the possibility of a third party perpetrator. Thus, the DNA analysis is limited to showing that the biological specimen did not belong to either the Petitioner or the victim.

-11-

## VII.  House v. Bell

As additional authority, Petitioner Alley relies upon the United States Supreme Court's recent decision in *House v. Bell*, 547 U.S. –, – S. Ct. – (June 12, 2006), in support of his entitlement to DNA testing.  Specifically, the Petitioner asserts that *House* is significant for two propositions: (1) *House* confirms Tennessee law that the determination whether a petitioner meets the standards of the DNA Act requires a consideration of all available evidence, including that evidence uncovered after the entry of the judgment of conviction; and (2) comparing the facts that led to the granting of relief in *House* with the facts before this Court confirms that the Petitioner is entitled to release of the evidence applying the "reasonable probability" standard.  Petitioner Alley asserts that "[e]valuating all the evidence, Alley's case for innocence based on the presumed exculpatory DNA evidence is *markedly stronger than House's*." (emphasis in original).

Petitioner Alley confuses the limited scope of the proceedings presently before this Court with a *Herrara* claim of actual innocence.  There is no authority permitting a reviewing court to consider evidence which was not admitted at trial.  *See Raymond Roger Jones v. State*, No. E2003-00580-CCA-R3-PC, 2004 WL 2821300, at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2004), *perm. to appeal denied*, (Tenn. Mar. 21, 2005) ("There are no Tennessee appellate court decisions holding that a post-conviction court may consider evidence that was excluded at trial in making this determination[.]").  Moreover, without engaging in a lengthy discussion comparing the factual evidence in the two cases, this Court finds the details of the two cases factually distinguishable.  The purpose of the Post-Conviction DNA Analysis Act is limited.  It is not a vehicle for raising claims of "actual innocence," but rather may, in certain instances, enable an "actual innocence" claim to be raised in future proceedings.

## VIII.  Evidence of Petitioner's Guilt

In this Court's 2004 review of the Petitioner's first petition for DNA analysis, the following summarization of facts was included as adopted from the Tennessee Supreme Court's decision on direct appeal:

> The victim was Suzanne Marie Collins, age 19, a lance corporal in the U.S. Marine Corps stationed at the Millington Naval Base, while she was pursuing courses in avionics. She was described by her roommate as a friendly, happy, outgoing person, always ready to help others with their problems. In the Marines, she was, "on the honor desk", which required the achievement of high standards, academically and otherwise and that, "you be a real motivated, squared-away Marine."

At approximately 10:00 p.m. on 11 July 1985 she left her barracks dressed in physical training gear, a red Marine T-shirt, red Marine shorts, white socks and tennis shoes and went jogging on the Base, north of Navy Road. Her roommate indicated that the victim had been too busy that day to work out at the gym, which was closed at that time of night. Her body was found the next morning in Orgill Park, which adjoins the Naval Base, north of Navy Road.

Defendant was not in the military service but was married to a military person and they lived on the Naval Base. He was employed by a Millington heating and air conditioning company. He was almost 30 years old, had two children, born of an earlier marriage, living in Kentucky, and had a history of alcohol and substance abuse. After appropriate *Miranda* warnings defendant waived the presence of an attorney and gave a lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985. The statement was tape recorded with defendant's permission. A narrative account of the relevant events of that evening as he related them to the Naval officers follows.

About 7:00 p.m. on 11 July 1985, his wife left with two women to go to a Tupperware party. Defendant had been drinking beer before they left and by approximately 9:00 p.m. he had consumed an additional six-pack and a fifth of wine. At that time he drove his 1972 Mercury station wagon, with a Kentucky license tag to the Mini Mart and purchased another six-pack. He was depressed, lonely and unhappy. He had no friends "of his own" here. He missed his two children, his mother and father, all Kentucky residents. He was torn between going to Kentucky, staying where he was, or driving the car into a wall to kill himself. He drove to the north side of the Base, parked on a lot near the golf course and started running toward Navy Lake. He ran past a girl jogging and before he got to the lake he stopped, she caught up with him and they had a brief conversation. He did not know her name and had never seen her before. They turned around and jogged back to his car. He stopped there out of breath, and she continued on toward the gate at Navy Road. He started driving down the road toward that gate in spite of his apparent recognition that he was drunk and weaving from side to side on the roadway. Parenthetically, the asphalt road in that vicinity has narrow lanes, no curb, the grass covered shoulders and nearby terrain are approximately level with the roadway. He heard a thump and realized he had struck the girl jogger. Quoting from his statement, "she rolled around and screamed a couple of times and I ran over and grabbed her and told her I was going to take her to the hospital. I helped her into the car and we started towards. . . ."

On the way to the hospital defendant said that she called him names such as a drunken bastard and threatened to get him in trouble and he tried to calm her down, without success. When he reached the traffic light on Navy Road near the 7/11 store he turned left and again went to the north part of the Base in the vicinity of the lake. He described in considerable detail the subsequent events, that included hitting her a few times, holding her down on the ground, and sticking a screwdriver in the side of her head, under circumstances apparently calculated by defendant to appear to be accidental. All of these actions were because she would not listen to his pleas not to turn him in.

He insisted that he did not have sex with her at any time, nor did he even try at any time. He insisted that he was scared of the trouble she was threatening him with and was drunk and could not think clearly. After sticking the screwdriver in her head and her collapse, he decided to make it appear that she had been raped. He took off her clothes, and dragged her by the feet over near a tree. There he broke off a tree limb, inserted it in her vagina and "pushed it in." He then ran to the car and drove away.

The State called numerous witnesses who observed some of the movements of defendant and victim that night.

A Naval officer driving north toward the lake on the Base passed two male Marines jogging north, and later saw a female Marine in red T-shirt and red shorts also jogging north. After passing the lone Marine he saw a white male near an old station wagon with wood paneling that was parked on an empty lot near the buffalo pens. The two Marines testified that as they jogged north a female Marine was jogging south and shortly thereafter they encountered a station wagon with wood grain paneling also going south that swerved over into the north lane towards them. The car continued on southward and when they were several hundred yards further north they heard a female voice screaming in distress, "Don't touch me", "Leave me alone." They immediately turned around and ran south in the direction of the scream. It was too dark to see any activity very far ahead and before they reached the scene they saw the station wagon drive off toward the main gate. At that time they were about 100 yards away and were able to observe that the station wagon was off the road in the grass, near the fence, on the left or wrong side for a vehicle going south. Suspecting a kidnapping they continued on to the gate and gave a full report of what they had witnessed. They accompanied military security personnel on a tour of the residential areas of the Base looking for the station wagon, without success. However, after they returned to their barracks, they were summoned to the security offices where they identified the station wagon. Defendant had been stopped and brought in for questioning as had his wife. Their responses had allayed any suspicion that

defendant had been connected with a kidnapping and they were allowed to go home. All of these events occurred before approximately 1:00 a.m., 12 July 1985. The victim's body was found shortly before 6:00 a.m. on that date and defendant was promptly arrested by the military police.

After completing the statement, defendant voluntarily accompanied officers over the route he had taken the night before and to the location of the murder and accurately identified various things, including the tree where he had left the body and where it was found by others and from which the limb he used had been broken.

The pathologist, Dr. James Bell, testified that the cause of death was multiple injuries. He also identified several specific injuries, each of which could have been fatal. The victim had bruises and abrasions over her entire body, front and back. He testified that the injuries to the skull could have been inflicted by the rounded end of defendant's screwdriver that was found near the scene, but not by the pointed end. He identified the tree branch that was inserted into the victim's body. It measured 31 inches in length and had been inserted into the body more than once, to a depth of twenty inches, causing severe internal injuries and hemorrhaging. The pathologist was of the opinion that the victim was alive when the tree limb was inserted into her body. There were also bruises on the victim's neck consistent with strangulation.

*Alley*, 776 S.W.2d at 508-10 (footnote omitted).

Additionally, this Court noted the following facts in its 2004 review of the Petitioner's request for DNA analysis:

At trial, Petitioner Alley relied upon an insanity defense. *Alley,* 776 S.W.2d at 510. Alley presented the testimony of two psychologists who diagnosed the Petitioner as suffering from a multiple personality disorder. *Id.* However, neither doctor could verify whether an alternate personality was in control at the time of the offense. *Id.* The State's psychologist also examined the Petitioner and determined that psychological tests administered to the Petitioner in May 1986 suggested that he was exaggerating or malingering. *Id.* at 510-511. The State's psychologist further noted that Petitioner had no history of mental health treatment prior to the murder and that it was "improbable that a condition of insanity had taken control of his actions on the evening of the murder." *Id.* at 511. In sum, the State's psychologist, while diagnosing a borderline personality disorder with a chronic history of drug and alcohol abuse, found no evidence of multiple personality disorder or psychosis. *Id.*

-15-

Dr. Craig Lahren, an expert in hair analysis, and Paulette S[utton], an expert in forensic serology, also testified at the Petitioner's trial. Dr. Lahren examined a hair collected from inside the victim's shoe. Dr. Lahren determined this hair to be a "Caucasian pubic hair." He stated that "[t]here was nothing unusual or unique about the item, and the sample was too limited to actually do a fair comparison with the-with the known pubic hair." A hair found on the victim's waistband was examined and determined to be a "medium-brown Caucasian body hair, probably from the arm or the leg." Again, there was not "enough consistent microscopic characteristics" to "do a successful comparison on those." Two strands of hair collected from the victim's socks were identified as being from an African-American. Dr. Lahren testified that the presence of these hairs on the victim's socks would be consistent with the victim walking around in her "sock feet." Four hairs found on the victim's shirt were "light-brown Caucasian head hair. They range from two to seven inches in length. . . ." These hairs were determined to belong to the victim. Finally, hair found on the driver's side of the Petitioner's 1972 Mercury station wagon "appeared to be the same as [the victim's] head hair."

Paulette S[utton] examined blood specimens found at the crime scene. Blood was found on the driver's side door and near the headlight of the Petitioner's vehicle. The blood found on the driver's side door revealed ABO type blood, the same type as the victim. The stain was found to be consistent with bloody hair having been swiped across the surface just above the door handle going downward toward the road. Paulette S[utton] also examined a bloody napkin found on the floorboard of Petitioner's car. She was not able to determine the species origin for the sample. Similarly, there was blood on a screwdriver found at the scene, but S[utton] could not identify the source. There was no blood or seminal stains found on the victim's clothing. Blood was found on the Petitioner's shorts, but a blood type could not be determined.

*Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at **6-7.

## IX. The Statutory Criteria

### A. *Existence of Evidence*

In response to Petitioner Alley's request for DNA analysis, the State asserted that certain evidence requested by the Petitioner is either no longer in existence or has been severely contaminated to the point that the reliability of any testing would be highly suspect. The

Assistant District Attorney General stated that, in 1990, an evidence storage freezer at the University of Tennessee malfunctioned, resulting in the destruction of certain evidence. He reported that the University of Tennessee was the custodian of the biological samples obtained from the autopsy, clothing, and the Petitioner's vehicle. Based upon the statements by the Assistant District Attorney General, the lower court found that "certain items are not still in existence or are not suitable for testing; thus, petitioner fails to meet the statutory requirements with regard to those items." Specifically, the lower court found the following items no longer in existence for DNA testing or in a condition suitable for DNA testing: (1) blood and hair found in the Petitioner's vehicle; (2) broken fingernail obtained from the victim;[2] (3) samples taken from the victim and the Petitioner; and (4) swabs taken from the victim's body. The lower court found that the remaining items upon which testing was sought were in possession of the Shelby County Criminal Court Clerk.

Collateral to his request for DNA analysis, the Petitioner sought permission to take depositions to identify the current location of evidence which may be subject to DNA testing. The State responded, in part, that Petitioner's counsel admitted, in 2004, before a federal district court that "their investigation revealed that the UT evidence did not exist anymore and that the only evidence left for testing was in the custody of the Criminal Court Clerk, William Key." The lower court denied the motion, finding that nothing in the Post-Conviction DNA Analysis Act mandated a court to permit depositions. We agree. No provision in the DNA Act mandates that the trial court permit depositions. While Tennessee Code Annotated section 40-30-311 permits a trial court to "make such other orders as may be appropriate," this provision is discretionary, not mandatory. Thus, we find no error in the post-conviction court's denial of the Petitioner's motion to take depositions. The record supports the lower court's findings as to the non-existence of certain items for testing. We find no viable reason to disagree with this finding. The petition proceeds on the following items:

1. Men's red underwear;

2. Stick and paper in which stick was wrapped;

3. Sleeveless jersey type shirt;

4. One white tube sock belonging to the victim;

5. One pair of jogging shorts belonging to the victim;

6. The victim's bra;

7. The victim's white cotton panties;

---

[2]The Assistant District Attorney General maintained that a "broken fingernail of the victim" never was recovered and, thus, does not exist for testing. He further maintained that, if a fingernail was recovered, that evidence would have been in the custody of the University of Tennessee. Accordingly, if a fingernail existed, it would have been destroyed with the other biological evidence. A review of the records reveal that a "mid fingernail" was received by the University of Tennessee Laboratory from the "morgue." While it is unknown whether this is the fingernail that the Petitioner seeks to have analyzed, it is clear that this evidence along with vaginal swabs, blood samples, and other specimens were in the possession of the University of Tennessee Laboratory.

8. Blue exercise belt belonging to the victim;

9. Left jogging shoe belonging to the victim;

10. Right jogging shoe belonging to the victim;

11. Styrofoam drinking cups;

12. Bloodstained grass collected from beneath the victim's vaginal area; and

13. Beer bottles.

These items are alleged to be in the custody of the Criminal Court Clerk for Shelby County.

## B. Evidence Previously Subjected to DNA testing

The post-conviction court found that "under prong three of the statute, the evidence sought by the petitioner for testing has never been subjected to DNA analysis. Thus, this court finds prong three of the statute is met." No reason exists to dispute the lower court's ruling as to this prong.

## C. Reasonable Probability of Different Result

The Post-Conviction DNA Analysis Act was created because of the possibility that a person has been wrongfully convicted or sentenced. *Jack Jay Shuttle v. State*, 2004 WL 199826, at *5 (citation omitted). In this regard, the post-conviction court is to assume that the "'DNA analysis will reveal exculpatory results in the court's determination as to whether to order DNA testing.'" *Id.* (quoting *Ricky Flamingo Brown, Sr. v. State*, No. M2002-02427-CCA-R3-PC, 2003 Tenn. Crim. App. LEXIS 528, at *7 (Tenn. Crim. App., at Nashville, June 13, 2003), *perm. to appeal denied,* (Tenn. 2003)). The Petitioner asserts, relying upon prior decisions of this Court, *see generally Jack Jay Shuttle*, 2004 WL 199826, at *1, that the determination of whether a particular case meets the reasonable probability standard is not based on the type of evidence that was used to obtain the conviction, nor on the strength of the State's case. That is, neither a victim's identification of a perpetrator nor a defendant's pretrial confession may form the sole basis for denying DNA testing. Rather, he contends, what is decisive under the reasonable probability standard is the probative value of the evidence sought to be tested or, in other words, the significance that exculpatory DNA test results would have in the case. The Petitioner strenuously asserts that the results of testing need not only be considered individually, but also collectively, in order to obtain what the Petitioner refers to as "redundant results."

In *Alley I*, this Court stated that "[a] 'reasonable probability' of a different result exists when the evidence at issue, in this case potentially favorable DNA results, undermines confidence in the outcome of the prosecution." *Sedley Alley*, 2004 WL 1196095, at *9; *see also State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). This Court recognized that

"[t]he purpose of the Post-Conviction DNA Analysis Act is to establish the innocence of the petitioner and not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant." *Sedley Alley*, 2004 WL 1196095, at *9. If the allegation of the petitioner's innocence is recent and the evidence supports the petitioner as the offender, a prior confession may be enough to deny DNA testing. *Id.*; *see also Jesse Haddox v. State*, No. M2003-00514-CCA-R3-PC, 2004 WL 2544668, at *4 (Tenn. Crim. App., at Nashville, Nov. 10, 2004). The convicted defendant requesting post-conviction DNA analysis is not provided a presumption of innocence, and the reviewing court need not ignore the proof supporting the conviction.

The post-conviction court concluded that the Petitioner has failed to demonstrate a reasonable probability that he would not have been prosecuted or convicted if exculpatory DNA evidence had been obtained from any of the requested items or any combination of the requested items. In reviewing the post-conviction court's conclusion, we, as did the post-conviction court, review the existing evidence along with "potentially favorable" DNA results. As stated in this Court's 2004 opinion, a summary of the existing evidence identifying Petitioner Alley as the perpetrator is as follows:

> 1. Petitioner Alley gave a lengthy and detailed confession, including accompanying law enforcement officials to the scene, where he identified the location where the body was found and the tree from which he obtained the limb used to penetrate the victim. Interestingly, Petitioner Alley never contested the validity of his factually detailed confession until May 2004, nearly twenty years after the date of his confession and thirty days before his scheduled execution date.

> 2. Three witnesses described the vehicle located in the area of the abduction as a late model green or brown Ford or Mercury station wagon with wood-paneling and Kentucky tags. The vehicle was described as having a loud muffler. Two Marines later identified the Petitioner's vehicle as being the vehicle at the scene of the abduction. The Petitioner's vehicle was a dark green 1972 Mercury station wagon with wood paneling and a Kentucky license plate.

> 3. The Petitioner informed law enforcement officers that he struck the victim on the side of the head with a screwdriver. A screwdriver was found near the crime scene. The medical examiner described a contusion to the victim's head as being consistent with the injury inflicted by the blunt end of a screwdriver.

4.     The Petitioner informed law enforcement officers that he struck the victim with the front driver's side of his vehicle.  Blood was found on the headlights on the front driver's side of his vehicle.

5.     The Petitioner told his wife, Lynne Alley, "Yes, I killed the gal at . . . Orgill Park."

6.     Thirty-one areas of staining on the Petitioner's blue-jean shorts worn the night of the crime tested positive for blood.  The shorts appeared to have been freshly laundered.

7.     A bloody head hair found on the front driver's side door of Petitioner Alley's car belonged to the victim.

8.     Blood on the driver's side door of Petitioner Alley's car was of the same ABO blood type as the victim.

9.     Petitioner Alley defended on the ground of insanity, specifically, that he suffered from multiple personality disorder.  This theory remained consistent at trial, on direct appeal, and in his post-conviction proceedings.

10.     The victim was quartered with other military personnel in a marine barracks, and her body was found in a public park.

11.     The jury was informed that numerous hairs were found on the victim's clothing and at the crime scene.  The jury was further informed that some of the hairs belonged to the victim, some to neither the victim nor the Petitioner, and some were insufficient to permit microscopic comparison analysis.

12.     The State's theory at trial did not involve sexual intercourse, but rather, an act of sexual mutilation with a thirty-one-inch tree limb being inserted into the victim's vagina.  This theory was consistent with the Petitioner's statement to law enforcement.

## Redundant DNA Test Results

While the Petitioner places great emphasis upon "redundant DNA results," this Court is unpersuaded that his "redundant results" analysis differs from an individual determination as to the "favorable" nature of each item's DNA testing results. In essence, the crux of the Petitioner's request for consideration of "redundant" test results is that the absence of the Petitioner's DNA from these samples, or any combination thereof, establishes his innocence of the murder. We are not persuaded by this argument. As stated previously, the Post-Conviction DNA Analysis Act does not envision DNA testing of third-party individuals nor does it contemplate a new investigation for a speculative phantom defendant. This Court is not inclined to disregard the overwhelming evidence against the Petitioner and, at this late date, embrace an entirely new theory of the crime. Even assuming that DNA testing of the numerous items requested by the Petitioner would generate results indicating an absence of the Petitioner's DNA from these items, this would not, with consideration of the plethora of credible evidence against the Petitioner, establish his innocence of the murder or convince this Court that he would have been neither prosecuted nor convicted if this DNA evidence had been revealed to the jury.

### (1) Victim's Jogging Shoes

Petitioner Alley seeks DNA testing on the jogging shoes belonging to the victim regarding what appears to be bloodstains and also on a hair. The record reveals that the shoes were previously tested for the presence of blood. Paulette Sutton testified at the Petitioner's trial that the test for blood on the shoes showed a presumptive negative. Petitioner Alley now contends that his expert has identified what he believes "may" be blood on the shoe. The post-conviction court concluded that the Petitioner had failed to demonstrate that such evidence exists for testing. Moreover, the post-conviction court found:

> Even if the petitioner could demonstrate through testing that there is blood on the shoe and the blood does not belong to him, there is no reasonable probability that such a result would have precluded prosecution or conviction. The blood is likely from the victim. Even if the petitioner, were to find the blood was from an unknown male source, this information is of little use. . . . Furthermore, . . . the victim lived and worked in a public place. The blood on her shoe could have come from anyone that she routinely came in contact with or from the roadside where she frequently ran.

As to the hair sample, any DNA testing of the hair sample with results not matching the Petitioner or the victim would merely establish that the victim came in contact with a third party at some point in time. The victim lived in communal military quarters. It is conceivable that a third party's hair attached to her shoes in her everyday routine. Moreover, the hair, even if proven to belong to a third party, does not negate the remaining evidence, including the Petitioner's factually specific confession, which strongly identifies the Petitioner as the

perpetrator. Moreover, Paulette Sutton previously examined both the victim's left and right shoes. She determined that the spots on the shoes did not test positive for blood. The Petitioner has failed to establish the presence of a biological specimen for DNA testing.

## (2) Men's Red Underwear

The Petitioner contends that DNA testing should be conducted on a pair of red underwear found at the crime scene. Trial testimony established that there was no blood or semen found on the underwear. Nonetheless, the Petitioner maintains that the underwear can be tested for skin cells or other habitual wearer DNA to identify the person who wore the underwear. The Petitioner further asserts that the State's theory at trial was that the red underwear, found near the victim's body, belonged to the perpetrator.

While the evidence at trial suggested that the red underwear did not belong to the victim due to the size difference, no proof was introduced establishing that the red underwear belonged to the perpetrator. Thus, while the State argued in closing argument that the red underwear belonged to the perpetrator, argument is not proof. In determining the significance of exculpatory results of DNA testing on the red underwear, the post-conviction court noted:

> [T]his court must consider the proof from the whole trial and how this piece of evidence fits before determining whether testing should be allowed. This court gives considerable weight to the potential effect on the jury that exculpatory results might have with regard to this particular piece of evidence. However, given the overwhelming evidence against the defendant and the fact that the State never specifically tied the underwear to the defendant at trial, this court finds petitioner has failed to show there is a reasonable probability that exculpatory results would have led the State to forego prosecution and/or resulted in petitioner not being convicted.

We agree. No evidence identifies the red underwear as belonging to the Petitioner. The Petitioner's confession fails to make any reference to the Petitioner's clothing. In fact, the only mention of any clothing belonging to the Petitioner on the night of the murder are the Petitioner's blue-jean shorts, which tested positive for human blood. Moreover, it appears from the record that this evidence has been in the custody of the Shelby County Criminal Court Clerk for the past twenty-plus years. Again, the issue of contamination must be considered in view of the numerous individuals who have come into contact with the underwear. Accordingly, even should DNA testing reveal the presence of DNA belonging to a third party, as alleged by the Petitioner, there is a strong possibility that this DNA will not belong to the perpetrator. Finally, even should the Petitioner be able to establish that DNA testing would only reveal the DNA of

the actual "wearer" of the red underwear, this evidence falls short of exculpating the Petitioner as the perpetrator in light of his confession and the eyewitness identification of the Petitioner's car.


### (3) Victim's Red Marine Corps T-Shirt and Bra


Petitioner Alley contends that the victim's t-shirt and bra reveal a stain on the left breast area consistent with saliva, semen, or mucous that could be tested for DNA. The Petitioner further contends that the t-shirt possibly contains a bloodstain on the back as well as perspiration. Regarding the stains on the front of the shirt and on the bra cup, the Petitioner asserts that stains are saliva from the perpetrator biting the victim's breast as the autopsy report revealed contusions to the breast area. As noted by the post-conviction court, this evidence was examined by Paulette Sutton who determined that no blood, semen, or other bodily fluids were present on the bra or t-shirt. The post-conviction court further found:


> [T]his court finds petitioner's assertion that stains are present on [the] victim's shirt with biological worth highly suspect, especially in light of the fact that the shirt has been in the evidence room with other items for nearly twenty years. . . .


> Initially, this court notes that there is no way to demonstrate that the purported stain is associated with the crime. It could have just as easily predated the crime; and could also be of some nature other than biological material. However, . . . this court will assume that there are biological materials on the victim's shirt that do not belong to the defendant. It appears from petitioner's argument that he claims the stains are saliva from the perpetrator biting the victim's breast. However, assuming even that the stains are of the must exculpatory nature – i.e. saliva not belonging to the petitioner, given the proof in this case, this court finds there is not a reasonable probability that the defendant would not have been prosecuted or convicted. The petitioner has continued to try to implicate the victim's boyfriend; however, any such stain could have been left during a consensual sexual encounter. Moreover, given the fact that the defendant gave a lengthy confession, a detailed walk through of the crime scene, and continued to admit his guilt to his wife even after he was in jail, it is not likely that this information would have prevented petitioner's prosecution or conviction.


Regarding exculpatory results on testing of the victim's bra, the court stated:


> [T]he court again notes that such evidence could have been left through a consensual sexual act. Given this fact and, given the evidence against the defendant[,] the court again finds that even if the specimen were sufficient for testing and still in good enough condition to test and such tests excluded petitioner

as the source of the specimen, a reasonable probability would not exist that such a result would have precluded prosecution and/or conviction.

A review of the record from the Petitioner's direct appeal reveals that the Petitioner denied any physical contact with the victim's breast. Additionally, the Petitioner denied any sexual intercourse or contact with the victim, other than the act of sexual mutilation. As stated by the post-conviction court, it is more likely than not that the contusions on the victim's breast were the result of a consensual sexual encounter. Additionally, as noted by the State, there is no evidence indicating whether the t-shirt and bra were freshly laundered before the victim's murder. As such, it is possible that any stain on the t-shirt and bra predates the crime. Merely detecting DNA from another individual on the victim's clothing, in the absence of any evidence as to how and when that DNA was deposited, would not exculpate the Petitioner by pointing to a different assailant. As the Petitioner denied any contact with the victim's breast, this Court would be constrained to conclude that DNA testing on the bra and t-shirt excluding the Petitioner and the victim would have resulted in the Petitioner not being prosecuted or convicted of the crime.

### (4) Victim's Underwear

Petitioner Alley contends that the crotch area of the victim's panties is stained with biological material that can be tested for DNA. The post-conviction court properly noted that the underwear had previously been tested by Paulette Sutton who determined that the underwear did not contain semen or blood. The post-conviction court determined that "if [Sutton's] conclusions were incorrect and even if subsequent testing revealed the petitioner was not the source of any biological material, there is not a reasonable probability that such results would have precluded his prosecution or conviction." In this regard, the post-conviction court noted that "the stains could be bodily fluids from the victim or they could be fluids from a previous consensual sexual act." Moreover, since the State's theory was one of sexual mutilation and not penile penetration and because the Petitioner denies penile penetration of the victim, we agree with the post-conviction court's finding that "it is unlikely that the fact that testing [of the victim's underwear] excluding the petitioner as the source of any biological material on the victim's underwear, would have a significant impact on the jury."

### (5) One White Tube Sock Belonging to the Victim

Petitioner Alley next seeks DNA testing on hairs found on the victim's sock as well as testing on what appears to be a bloodstain on the sock. First, we note that the Petitioner requested DNA testing of a hair found on the sock in his 2004 petition. This request was denied. Moreover, Paulette Sutton examined the sock prior to the Petitioner's trial and concluded that no blood or semen was found on the sock. The post-conviction court declined DNA testing on the

sock, finding that, in addition to these fact, DNA testing was not warranted "due to the public nature of the victim's living arrangement even assuming results excluding the defendant were found." The post-conviction court further found that "if there are new hairs on the socks that were not found by Sutton or Lah[re]n, it is just as likely they were deposited there by court personnel sometime over the last twenty years."

The record supports the post-conviction court's finding. The victim was quartered in public accommodations and it is conceivable that stains and hairs collected on the victim's socks due to the nature of her living arrangements. The Petitioner has failed to demonstrate that a reasonable probability exists that he would not have been prosecuted or convicted if the socks revealed the DNA of a third party.

### (6) Victim's Jogging Shorts

Petitioner Alley also contends that the victim's jogging shorts found at the crime scene contain a possible bloodstain. Again, Paulette Sutton testified at the Petitioner's trial that the shorts did not contain any blood or semen stain. The post-conviction court found that, if a stain did exist, "the stain could belong to the victim; but even excluding the victim, this court finds the defendant does not meet the statutory requirements. Like the alleged stain on the shirt, this court finds the stain on the shorts could have predated the crimes and could be the result of consensual sexual activity. Thus, even if there is such a specimen and testing reveals it is consistent with a source other than the defendant, this court finds there is not a reasonable probability that prosecution and/or conviction would have occurred in this case."

There is no indication in the record, other than the bare allegation of the Petitioner, that the stain would reveal the presence of semen or blood. In fact, Paulette Sutton testified to the contrary. Moreover, since there is no evidence regarding the pre-crime condition and history of the victim's shorts, DNA testing results excluding the Petitioner's DNA from the shorts, in light of the overwhelming proof to the contrary, do not create a reasonable probability that the Petitioner would not have been prosecuted or convicted.

### (7) Blue Exercise Belt

Petitioner Alley also seeks DNA testing on the victim's blue exercise belt found at the crime scene. The Petitioner contends that the exercise belt contains biological specimens and hairs that are suitable for DNA testing. While it is unclear whether the exercise belt contains any biological evidence other than hairs, the post-conviction court noted that it is likely that the biological material on the exercise belt is "sweat, or nasal secretions or some other biological specimen belonging to the victim." The post-conviction court assumed, however, that the

-25-

biological material is "not from either the defendant or the victim." The post-conviction court continued:

> [S]ince this court is unclear what exact "biological" material the petitioner portends is on the belt, the court finds a reasonable probability does not exist that the exclusion of both defendant and victim as depositors of the substances would preclude the petitioner's prosecution or conviction. If the material is sweat or even nasal secretions, it is possible the victim loaned the belt to others to use for exercise and any number of people could have deposited biological material on the belt. Additionally, as previously mentioned[,] the victim was the resident of a public barracks and could have contacted the materials there.

The post-conviction court further noted that the Petitioner previously sought DNA testing on hairs found on the exercise belt which was denied. *See Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *10. In affirming the lower court's prior denial of DNA testing on hairs found on the exercise belt, this Court noted that, "even if proven to belong to a third-party, does not negate the remaining evidence which strongly identifies the Petitioner as the perpetrator." *Id.* The fact that genetic material belonging to a third party could be found on the victim's exercise belt does not lead this Court to the conclusion that the Petitioner would not have been prosecuted or would not have been convicted of the crime.

### (8) Three Styrofoam Cups

Petitioner Alley maintains that he should be permitted to conduct DNA testing on three Styrofoam cups found near the victim's body. The post-conviction court made the following findings:

> [T]his court notes that testimony from the trial court indicated that the cups were sent to a lab to be tested for the presence of bodily fluids and none were found. . . . Petitioner has given the court no reason to doubt that the cups either contain biological material or any such samples are insufficient for testing. Nevertheless, even if tests could be performed and such tests excluded the defendant as the source of the specimen, given the overwhelming proof in this case, the court finds there is not a reasonable probability that the petitioner would not have been prosecuted or convicted. In addition to the incriminating evidence already mentioned by this court, of additional significance is the fact that the victim's blood and hair were found on the defendant's car, blood was found on his clothing, and a napkin found at the scene resembled one found in the defendant's car.

-26-

This Court concludes that the post-conviction court has not abused its discretion in finding that the Petitioner did not establish a "reasonable probability" that the State would not have sought prosecution or that he would not have been convicted if DNA testing on the three Styrofoam cups failed to reveal the presence of his DNA. The victim's body was found in a public place. It is highly likely that other persons had visited the area and deposited the Styrofoam cups. The Petitioner's confession fails to include any reference to Styrofoam cups.

### (9) Beer Bottles

At the Petitioner's trial, unopened, full bottles of beer were identified. Fingerprints collected from the beer bottles did not match those of the Petitioner or the victim. The Petitioner contends that testing should be permitted to test the bottles for traces of DNA. The post-conviction court made the following findings:

> This request completely fails to meet the first prong of the statute. In reality the beer bottles were not found close to the body. This court realizes that "near" is a relative term; but the trial transcript reveals that the beer bottles were actually "not in the particular area of the scene." . . . The bottles were found in an area resembling a picnic area and were located both in and out of the trashcan. . . . Further testimony revealed that the bottles were found approximately ½ to 3/4 of a mile away from the body.

The bottles and the body were found in a public area. Clearly, even if the bottles showed the presence of DNA from someone other than the defendant or victim, given the overwhelming proof of the defendant's guilt, as outlined in this order, this fact would not lead to a reasonable probability that the defendant would not have been prosecuted or convicted.

The record supports the post-conviction court's conclusion on these requested items. It is highly probable that the beer bottles found in a public area "four-tenths of a mile from the entrance of the roadway where the road forks" compared to the location of the victim's body "one-half mile from the entrance of the roadway on the south road" contained the DNA of neither the Petitioner nor the victim. The fact that genetic material belonging to a third party could be found on these beer bottles would not have resulted in the Petitioner not being prosecuted or convicted of the crime.

### (10) Bloodstained Grass Collected from Beneath the Victim's Body

Petitioner Alley contends that he should be permitted to test grass recovered from beneath the victim's vaginal area which may contain bodily fluids. At the Petitioner's trial, Paulette

Sutton testified that "five individual bags of dirt and grass" were submitted for analysis. She examined the contents of all of the bags, except one, explaining that one bag "actually had mold on the outside of the bag, and I didn't even open it for further analysis. It just wouldn't have been any good." Sutton continued that "[t]hree of the bags, I could not see any bloodstains on the grass, and on one, there was blood present." Based upon Sutton's testimony, one bag of evidence is unavailable for testing. Since these samples were in the custody of Ms. Sutton, it is possible that these samples are no longer in existence. Notwithstanding, as the lower court presumed that some of these samples were still available for testing, we, too, will so presume.

Again, the Petitioner has never alleged that he sexually penetrated the victim to the degree which would have resulted in his depositing semen at the scene of the crime. It is most likely that the blood identified on the grass samples belongs to the victim as it was found beneath her vaginal area. However, even should the samples contain DNA evidence belonging to neither the Petitioner nor the victim, we would be constrained to conclude that such evidence would have precluded the Petitioner's prosecution or conviction.

### (11) Tree Limb and Paper in which Limb was Wrapped

Petitioner Alley seeks testing on the tree limb used to rape, brutalize, and kill the victim and the paper in which the limb was wrapped. Although the Petitioner previously sought post-conviction DNA testing on a hair found on the tree limb, he has altered his request in the present petition to test for blood and fluids found on the tree limb as well as for skin cells/sweat of the assailant. At the Petitioner's trial, the medical examiner testified that "blood evidence or red material evidence" was present on the external aspect of the tree limb that was protruding between the victim's legs. From the medical examiner's testimony, it was more likely than not that, due to the fact that the tree limb had been inserted, withdrawn, and reinserted at least twice, the blood on the limb was that of the victim. The post-conviction court made the following findings:

> [The Assistant District Attorney General] explains that the tree limb . . . was stored in an evidence "bin" in custody of the Criminal Court Clerk. [The Assistant District Attorney General] stated that the tree limb has been in this [bin], unsealed, open to the public and the elements for twenty years. The branch apparently is stored along with other evidence in this case. Despite defense counsel's arguments that such contamination has no effect on the potential DNA that may be recovered from the limb, this court finds that any such results would be highly suspect given the conditions that evidence has been in for twenty years. . . .
>
> . . . .

. . . This court finds petitioner's argument that the blood can now be tested after twenty years of exposure to the elements and the proposition that even if it were suitable for testing, the blood might belong to someone other than the victim preposterous. With regard to the stain the petitioner contends "might" be semen, as the State explained the limb has been loose and exposed for nearly twenty years; thus, it is just as likely the purported semen stain is actually some other substance. Finally, certainly, the contamination of the evidence would affect an examiner's ability to get an accurate profile from skin cells taken from the limb, if any such material even still exists on the limb.

As to the proposition that a reasonable probability exists that such evidence, if it excluded the defendant, would have resulted in either the State not seeking prosecution or petitioner not being convicted, this court finds that, with regard to the skin cells and hair, given the fact that the limb was taken from a public park, this argument is without merit. Moreover, given the medical examiner's testimony regarding the blood evidence on the limb, this court finds it unlikely the State would have forgone prosecution or the jury not convicted had DNA testing excluded defendant as the blood source. Finally, arguably had semen not belonging to the defendant been found on the limb, the question becomes a more difficult one. However, since the State's theory was not one of penile penetration and since the defendant claims he did not penetrate the victim with his penis such a result would not necessarily have precluded prosecution nor resulted in acquittal. It is likely that had the victim had consensual sex that some semen from the consensual act might have been transferred to the limb upon insertion. Thus, this court finds that given the breadth of incriminating proof at trial, even this result would not meet the first prong of the statute.

This Court cannot disagree with the post-conviction court's conclusion. It is more likely than not than any blood on the tree limb belongs to the victim. Moreover, as to DNA testing on the blood, skin cells, or any other biological specimen on the limb, we would be constrained to conclude that the presence of DNA belonging to neither the Petitioner nor the victim would have resulted in the State not pursuing prosecution or the jury not convicting the Petitioner. Our conclusion is based upon testimony evincing contamination of the limb. In addition to the uncontested assertion of the State that the limb has been "unsealed" in an "evidence bin" in the custody of the Criminal Court Clerk, the trial record indicates that numerous third persons have handled the limb. Indeed, the record of the direct appeal reflects that, at the Petitioner's trial, the limb was passed from the prosecutor to Dr. Bell for identification. Undoubtedly, third party DNA exists on the limb. The DNA Act does not require further investigation into the identity of third party DNA. Accordingly, even if testing would establish the presence of DNA of a third party and not the DNA of the Petitioner, with the consideration of the overwhelming proof and with the consideration of the contamination of the limb since the crime, we cannot conclude that

the State would have foregone prosecution of the Petitioner or that the Petitioner would not have been convicted.

### D. *Motivation of Bringing Petition*

The post-conviction court determined that Petitioner Alley failed to meet the criteria under subsection (4) of Tennessee Code Annotated sections 40-30-304 and 40-30-305. These provisions provide that the petition for DNA analysis must be brought for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice. T.C.A. §§ 40-30-304(4), -305(4). As to this criterion, the post-conviction court remarked:

> This court has serious questions regarding the motivations of the petitioner for raising this issue at this time. The petitioner sought to present much of these claims hours before his execution and has previously had the opportunity to litigate a portion of his request before this court, in a 2004 Petitioner for Post-Conviction DNA Analysis. A Petition which was also filed close to the time of his pending execution. While it is clear from the Statutes constituting the Act and the case law analyzing the Act that a petition for post-conviction DNA analysis may be brought at any time, the samples sought for testing by this petitioner have been available since before the trial. Much of the documentation supporting their request was available at trial. Throughout the direct appeal and the post-conviction of this case, petitioner has asserted that he committed the alleged acts, but was not sane at the time of their commission. Thus, the timing of petitioner's allegations is highly suspect.
>
> . . . This court does not believe petitioner seeks relief under the Act for the purpose of demonstrating actual innocence. Rather this court i[s] firmly convinced that the motivations of petitioner are quite different. It is clear to this court that petitioner seeks to delay his execution with this last minute successive petition for Post Conviction DNA Analysis.

The lower court's finding on this issue is supported by substantial evidence as it exists in the procedural history of this case. While it is true that the Petitioner is now represented by different counsel than in 2004, we cannot find present counsel blameless for not filing a more timely petition for post-conviction DNA analysis. Indeed, under direction of current counsel, Petitioner Alley sought in March 2006 access to this same evidence from the federal courts for DNA testing. The Petitioner fails to offer an explanation as to why no attempt was made in state court to test these additional items. Notwithstanding, even the request made in federal court was made shortly before the Petitioner's scheduled May 2006 execution. Finally, we note that the

Post-Conviction DNA Analysis Act was enacted in 2001. The Petitioner's convictions and sentences were affirmed by our supreme court in 1989. This Court must ponder why DNA testing was not requested until 2004, shortly before the Petitioner's scheduled execution, when the evidence sought to be tested existed prior to the Petitioner's trial and such relief had been available to him since 2001.[3] When a request to the federal court and a last-minute attempt to delay execution was made to the Governor of this State, this Court can only conclude that such efforts leading to the filing of the petition that is presently before this Court were made for the purpose of delaying the execution of the sentence.

## CONCLUSION

Upon our review of the record before us, including the Petitioner's motion for DNA testing, the State's response and previous opinions of this Court and our supreme court in the direct appeal and post-conviction proceedings, we conclude that the record supports the post-conviction court's conclusions that the Petitioner failed to establish that (1) a reasonable probability exists that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis; and (2) a reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the Petitioner's verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction. *See* T.C.A. §§ 40-30-304(1), -305(1). Accordingly, the post-conviction court did not err by denying the Petitioner's request for DNA analysis.

The judgment of the post-conviction court is affirmed.

_____
**DAVID G. HAYES, JUDGE**

---

[3]While the Post-Conviction DNA Analysis Act does not statutorily prohibit a defendant from filing unlimited successive petitions requesting DNA testing, neither can this Court condone such piecemeal litigation aimed at delaying the execution of a sentence. *See generally Hill v. McDonough*, – U.S.–, – S. Ct. –, 2006 WL 1584710, at *6 (June 12, 2006). Indeed, the United States District Court recently dismissed the Petitioner's §1983 action challenging the State's lethal injection protocol on the basis that the Petitioner had unduly delayed the filing of that action. *See Sedley Alley v. George Little*, No. 3:06-0340 (M.D. Tenn., Jun. 14, 2006).